1   THEODORE J. BOUTROUS, JR., SBN 132099
        tboutrous@gibsondunn.com
2   THEANE EVANGELIS, SBN 243570
        tevangelis@gibsondunn.com
3   MICHAEL H. DORE, SBN 227442
        mdore@gibsondunn.com
4   LAUREN M. BLAS, SBN 296823
        lblas@gibsondunn.com
5   LORI C. ARAKAKI, SBN 315119
        larakaki@gibsondunn.com
6   GIBSON, DUNN & CRUTCHER LLP
    333 South Grand Avenue
7   Los Angeles, CA  90071-3197
    Telephone:  213.229.7000
8   Facsimile:  213.229.7520

9   Attorneys for Plaintiff
    ASHLEY JUDD

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11           FOR THE COUNTY OF LOS ANGELES – SANTA MONICA

12

13
    ASHLEY JUDD, an individual,            CASE NO. ___SC1292___
14
             Plaintiff,                    **COMPLAINT FOR DAMAGES AND**
15                                         **EQUITABLE RELIEF**

16      v.                                 **(1) DEFAMATION AT COMMON LAW**
                                           **AND PURSUANT TO CIV. CODE, § 46**
    HARVEY WEINSTEIN, an individual,
17                                         **(2) SEXUAL HARASSMENT UNDER CIV.**
             Defendant.                    **CODE, §§ 51.9 AND 52**
18
                                           **(3) INTENTIONAL INTERFERENCE WITH**
19                                         **PROSPECTIVE ECONOMIC ADVANTAGE**

20                                         **(4) VIOLATION OF BUS. & PROF. CODE,**
                                           **§ 17200, ET SEQ. (UNFAIR COMPETITION**
21                                         **LAW)**

22                                         **(5) INJUNCTIVE RELIEF**

23                                         **DEMAND FOR JURY TRIAL**

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

APR 3 0 2018

Sherri R. Carter, Executive Officer/Clerk

By Maria Guadian, Deputy

1    Plaintiff Ashley Judd hereby alleges the following, on information and belief, against

2    Defendant Harvey Weinstein ("Weinstein"):

3                              ## SUMMARY OF ACTION

4    For many people, film is a form of entertainment. But for some, it is their business.

5    Writers, cinematographers, grips, make-up artists, directors, and actors are just some of the people

6    whose livelihoods involve the creation of films for people around the world to watch and enjoy.

7    Ashley Judd is one of the people who makes a living in this industry. She is a film, television, and

8    stage actor by trade and has been a member of the actors' union for more than 25 years. Acting is a

9    unique job that offers incredible opportunities for creative and personal fulfillment. But it is still a

10   job. And like any professional, an actor like Ms. Judd must rely on her experience and her reputation

11   to find work in the face of fierce competition.

12   What Ms. Judd did not know until December 2017 was that something unseen was holding

13   her back from obtaining the work she wanted, and had been doing so for decades. The headwind

14   limiting her career was Harvey Weinstein, and specifically, the false and malicious statements he

15   made regarding Ms. Judd's professionalism as an actor to the creative team behind the blockbuster

16   film trilogy *The Lord of the Rings* (also referred to as "*Lord of the Rings*"), and several international

17   hits that followed. That creative team, consisting of director Peter Jackson and his production partner

18   Fran Walsh, met with Ms. Judd in Los Angeles County in or around 1998 to discuss playing one of

19   two different major roles in the film trilogy. They shared confidential creative details about the films

20   with her and indicated that she could choose which role she wanted to play. Mr. Jackson and

21   Ms. Walsh then told Weinstein's company, Miramax, which owned the rights to *The Lord of the*

22   *Rings* at the time, that they wanted to cast Ms. Judd in the films. But Weinstein torpedoed

23   Ms. Judd's incredible professional opportunity when he told Mr. Jackson and Ms. Walsh that the

24   studio had had a "bad experience" with Ms. Judd, and that Ms. Judd was a "nightmare" to work with

25   and should be avoided "at all costs."

26   With those baseless smears, Weinstein succeeded in blacklisting Ms. Judd and destroying her

27   ability to work on what became a multi-billion-dollar franchise with 17 Academy Award wins and

28   many more nominations. He also effectively blocked Ms. Judd from future opportunities to work

with Mr. Jackson and Ms. Walsh.  Through no fault of their own, Mr. Jackson and Ms. Walsh

believed Weinstein—who was one of Hollywood's most powerful film producers and distributors at

the time—and Miramax, the company acting at his direction—and dropped their pursuit of Ms. Judd.

The pathetic reality, however, was that Weinstein was retaliating against Ms. Judd for rejecting his

sexual demands approximately one year earlier, when he cornered her in a hotel room under the guise

of discussing business.  A self-described "***benevolent dictator***" who has bragged that "***I can be***

***scary***," Weinstein used his power in the entertainment industry to damage Ms. Judd's reputation and

limit her ability to find work.[1,2,3]

Ms. Judd is not alone.  Other professional women learned that Weinstein was more than

willing to smear them and tarnish their reputations to punish them for trying to reject him, resulting

in both the actors' harm and Weinstein's financial gain.  These women and others have shared

powerful accounts of their experiences, with some enduring (and courageously surviving) significant

physical and emotional harm.  Ultimately though, this case is about business, and the central harm is

economic.  Weinstein's wrongful and outrageous conduct has not just deprived Ms. Judd of the

specific opportunity to play a prominent role in a blockbuster film trilogy; it has had a long-lasting

ripple effect on the trajectory of her whole career.  No person—in whatever job, in whatever

industry—should have to forfeit professional aspirations and the right to earn a living to the abusive

whims of the powerful.  Ms. Judd brings this complaint to vindicate that principle, and to right the

wrongs that Weinstein committed against her, among so many others.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter in this action pursuant to Article VI,

Section 10 of the California Constitution, because this case is not given by statute to other trial courts.

2.      In addition, the amount in controversy exceeds the minimum for unlimited civil

jurisdiction of this Court.

---

[1]  All emphases added unless otherwise stated.

[2]  https://www.huffingtonpost.com/2012/06/15/harvey-weinstein-obama-will-win_n_1601201.html

[3]  https://cbspressexpress.com/cbs-news/releases/view?id=32117

3

Gibson, Dunn &
Crutcher LLP

3.      This Court has jurisdiction over Weinstein because, on information and belief, he regularly conducts business in this State, and his unlawful conduct toward Ms. Judd predominantly occurred and caused harm in this State.

4.      Venue properly lies in this County in that Weinstein regularly conducts business in this County and the conduct and events giving rise to the claims described herein occurred in this County. Moreover, a number of the witnesses to the events in question reside or regularly transact business in this County, and relevant evidence is believed to be located in this County as well.

## PARTIES

5.      Plaintiff Ashley Judd is a resident of Tennessee.  During the time in which the first events underlying Ms. Judd's complaint occurred (approximately 1996 through 1998), Ms. Judd resided for several months at a time in Los Angeles County.  Ms. Judd has also resided in Los Angeles County for significant stretches of time on multiple other occasions between 1993 and 2017, when she first learned of the harms done to her by Weinstein.

6.      Defendant Harvey Weinstein is a resident of New York.  On information and belief, Weinstein regularly came to Los Angeles County between 1996 and 1998 to conduct business on his own behalf and on behalf of the Santa Monica-based company, Miramax, that he controlled. On information and belief, Weinstein has continued to come to Los Angeles regularly to conduct business on behalf of The Weinstein Company LLC, a California-registered business entity with an address in Los Angeles County.  On further information and belief, Weinstein owns a residence in Los Angeles County.

## FACTUAL ALLEGATIONS

7.      Harvey Weinstein has reveled in his power and influence over actors and filmmakers for years.  On multiple occasions, he bragged how one musician/actor once called him "**The Punisher**."[4] To get an actor to promote a film, he said, "*I can be scary*."[5]  He regularly touted his political and industry connections, took credit for launching careers, and played an active role in shaping film

---

[4]  http://deadline.com/2012/01/oscar-qa-harvey-weinstein-on-the-artist-dueling-best-actress-contenders-and-indie-film-in-the-vod-age-222391/

[5]  https://cbspressexpress.com/cbs-news/releases/view?id=32117

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

Gibson, Dunn &
Crutcher LLP

1    projects.  As the world now knows through numerous women's accounts, Weinstein used this power

2    and influence to sabotage the careers of women who resisted his unwanted sexual demands.

3         8.    In late 2017, before shifting tactics to attack his accusers, Weinstein cited his purported

4    *"demons,"* and admitted that *"the way I've behaved with colleagues in the past has caused a lot of*

5    *pain."*[6]  That behavior included taking purported "business meetings" in a bathrobe and demanding

6    massages and sexual favors.  Weinstein's more recent response to accusations against him, digging

7    up any photograph in which he appears with an accuser to implicitly call her a liar, is far more

8    genuine.  Weinstein is a predator and a bully, and his retaliation against women, including Ms. Judd,

9    for saying "No," is part of a pattern that reflects (among other things) the bad intent behind the

10   comments he made about Ms. Judd during casting discussions for *The Lord of the Rings*.

11   **A.    Weinstein's Rise to Power.**

12        9.    Weinstein was a major player in the entertainment industry for several decades, beginning

13   with the opening of a small movie theater in upstate New York in the early 1970s.  By 1979,

14   Weinstein founded a film company, Miramax, with his younger brother, Robert ("Bob").  Weinstein

15   and Santa Monica-based Miramax enjoyed increasing success throughout the 1980s and 1990s,

16   distributing and producing commercially successful—and in many cases, critically acclaimed—films

17   (including *Scandal* (1989); *Sex, Lies, and Videotape* (1989); *Tie Me Up! Tie Me Down!* (1989);

18   *The Crying Game* (1992); *Pulp Fiction* (1994); *Flirting with Disaster* (1996); and *Shakespeare in*

19   *Love* (1998)), which grossed hundreds of millions of dollars worldwide and won numerous Academy

20   Awards.  Along the way, Weinstein took credit for Miramax's decision to give several well-known

21   filmmakers their "early breaks."[7]

22        10.   As Miramax's—and by extension, Weinstein's—success grew, Weinstein gained more

23   power and cachet in the industry.  By the late 1990s, Weinstein was one of the most powerful and

24

25

26   _____

27   [6]  https://www.nytimes.com/interactive/2017/10/05/us/statement-from-harvey-weinstein.html

28   [7]  http://variety.com/1999/voices/columns/talented-weinstein-survives-a-bumpy-99-1117760139/

Gibson, Dunn &
Crutcher LLP

1    influential producers in the film business, declaring in one interview that "[i]f styles of filmmaking

2    are changing radically, *I feel like the godfather of that change* – that's the Miramax legacy."[8]

3          11.    On information and belief, at all relevant times, and even after the Walt Disney Company

4    agreed to purchase Miramax for nearly $60 million in 1993, Weinstein continued to enjoy nearly

5    plenary control of Miramax, its agents, the films it would produce and/or distribute, the budget of

6    those films, the casting decisions, and even the creative vision for them.[9]

7          12.    In contrast to Weinstein—by then an established figure—in or around 1997, Peter Jackson

8    and his producing partner Fran Walsh were just beginning their ascent to worldwide recognition and

9    success.  They received a 1995 Academy Award nomination for Best Original Screenplay for

10   *Heavenly Creatures* (1994), but their influence in the industry and ultimate control over projects

11   (including casting decisions) in the late 1990s was more limited than Weinstein's.

12         13.    In or around 1997, Mr. Jackson and Ms. Walsh were considering adapting J.R.R.

13   Tolkien's *Lord of the Rings* book trilogy into a series of films.  On information and belief, because of

14   a licensing requirement, any adaptation of the trilogy had to be offered first to Weinstein's company,

15   Miramax, which Mr. Jackson and Ms. Walsh did.  On information and belief, as a result of this

16   arrangement, Miramax developed the *Lord of the Rings* films for approximately 18 months, with

17   Weinstein involved in many casting discussions regarding the films.  Although Miramax eventually

18   sold the rights to the series to New Line Cinema ("New Line"), it retained a 5% stake in the films'

19   adjusted gross receipts, half of which ultimately accrued personally to Weinstein and his brother Bob.

20         14.    Weinstein continued to enjoy broad commercial and critical success during the 1990s and

21   2000s through dozens of projects, including the *Bridget Jones* films (2001 and 2004);

22   *Chicago* (2002); *Frida* (2002); *The Hours* (2003); the *Kill Bill* films (2003, 2004), and many others.

23   During this period, Weinstein wielded significant power and influence in the entertainment world and

24   beyond.

25

26

27
_____

[8]   http://variety.com/1999/voices/columns/talented-weinstein-survives-a-bumpy-99-1117760139/

28
[9]   Miramax continues to maintain an office in Los Angeles, California.

Gibson, Dunn &
Crutcher LLP
                                                    6
                          COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

**B.      Weinstein's Pattern of Predation and Threatening Actors' Careers.**

15.      For decades, Weinstein used his power and influence in the industry to target women like Ms. Judd and attempt to extract sexual favors while stating explicitly or implicitly that their career prospects hung in the balance.  Within the last six months alone, there has been no shortage of reports of Weinstein's decades-long pattern of abusive acts, and many reflected a similar plan and well-established modus operandi: on information and belief, in many instances, he would corner women in a hotel room under the guise of discussing business.  He often appeared only in a bathrobe and asked the women to watch him shower, or give him a massage.  Others described more graphic and explicit demands for sexual acts.[10]  When some of these women pushed back, he refused to take "No" for an answer.  And in multiple cases—as in Ms. Judd's, detailed below—he retaliated against them by threatening to derail or actually derailing their careers.

16.      For example, one actor and producer, Salma Hayek Pinault, publicly described encounters at hotels, after she had signed on to produce a film with Miramax, where Weinstein would appear unexpectedly at her door and ask her to allow him in.  He reportedly asked her to shower with him, to let him massage her, to let him give her oral sex, and to get naked with another woman.  At one point after Ms. Hayek Pinault steadfastly refused these requests, she recalls that Weinstein said, "*I will kill you, don't think I can't.*"  As she put it in an essay she wrote about the experience, "I don't think he hated anything more than the word 'no.'"  But Weinstein's manipulative conduct did not end there: on one occasion, he agreed to fund a film that had long been a passion project for Ms. Hayek Pinault—but, on information and belief, because she had refused his demands, he held the film hostage and refused to move forward with it unless she agreed to engage in an unscripted sex scene with another woman involving full-frontal nudity.  Feeling she had no choice five weeks into shooting and after the years of effort she had devoted to the film, Ms. Hayek Pinault complied.  Weinstein never offered her a starring role in a film again.[11]

---

[10]  *See* https://www.usatoday.com/story/life/people/2017/10/27/weinstein-scandal-complete-list-accusers/804663001/

[11]  https://www.nytimes.com/interactive/2017/12/13/opinion/contributors/salma-hayek-harvey-weinstein.html

Gibson, Dunn &
Crutcher LLP

17.     Another actor, Uma Thurman, has said publicly that she knew Weinstein "pretty well before he attacked me." At a meeting in Weinstein's hotel room in Paris, where they were discussing a script, on information and belief, he donned a bathrobe and led her to a steam room. Although Ms. Thurman described how she got away that time, she reported that on another occasion shortly thereafter, Weinstein charged at her in a hotel room and pushed her down while trying to expose himself. When she subsequently confronted him about it, he threatened to ruin her career—a credible threat given that, as Ms. Thurman put it, Weinstein had a "chokehold" on the type of films she wanted to work on and the directors she wanted to work with. Through a spokesperson, Weinstein framed these events as "***making a pass***" at Ms. Thurman "***after misreading her signals***." In response to Ms. Thurman's allegations, he sent what a reporter described as six "chummy photos" of Weinstein and Ms. Thurman at premieres and parties.[12]

18.     Another actor, Rosanna Arquette, endured similar predatory behavior. In the early 1990s, she was supposed to meet Weinstein at the Beverly Hills Hotel to pick up a script for a new film. When she arrived, she was directed to Weinstein's room. As Ms. Arquette described it to a reporter, he answered the door in a bathrobe, told her his neck was sore, and said that he needed a massage. He grabbed her hand and put it on his neck, and then forced her hand onto his erect penis. When she refused to give in to his sexual demands, he told her she was making a huge mistake by rejecting him, and suggested she would have a far easier time with her career if she complied. Ms. Arquette remained steadfast, and, on information and belief, lost a role because she rejected Weinstein.[13]

19.     Yet another actor—Annabella Sciorra—has stated publicly that Weinstein raped her in the 1990s. At the time, her career was taking off, and Weinstein's studio, Miramax, was taking on a more dominant role in the industry. Ms. Sciorra has described how, following the rape, Weinstein continued to sexually harass her. She has also noted that she felt the impact on her livelihood almost

---

[12]  https://www.nytimes.com/2018/02/03/opinion/sunday/this-is-why-uma-thurman-is-angry.html

[13]  https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories

Gibson, Dunn &
Crutcher LLP

immediately, stating that she believes she did not work from 1992 to 1995 because the "Harvey machine" spread a baseless rumor that she was "difficult." On information and belief, it was Weinstein who used his influence in the entertainment industry to make false statements of fact regarding Ms. Sciorra and harm her career.[14]

20.     These incidents reflect Weinstein's malicious intent to injure those who resisted him, including Ms. Judd. Another event showing that intent occurred in 1995, when Weinstein and actor Mira Sorvino were both at the Toronto Film Festival to promote the same film. As Ms. Sorvino has recounted publicly, Weinstein—who was a producer on the film she was in Toronto to promote—led her to a hotel room, started to massage her, and virtually chased her around the room. Ms. Sorvino managed to escape, but, undaunted, Weinstein contacted her a few weeks later claiming to have new marketing ideas for their film. When she offered to meet him in a public location to discuss it, Weinstein showed up at Ms. Sorvino's home instead, and left her alone only when she pretended that her boyfriend was about to come over.[15]

21.     On information and belief, Weinstein made false statements of fact about Ms. Sorvino to others in the film industry in order to punish her and damage her career. These comments included, but were not limited to, statements made to Mr. Jackson and Ms. Walsh in a private business meeting that Ms. Sorvino was "a nightmare to work with," "should [be] avoid[ed] at all costs," and that Miramax had had a "bad experience" with her in the past.[16] As in Ms. Judd's case, these statements both were false on their face and falsely implied that Weinstein had knowledge of negative experiences working with Ms. Sorvino.

22.     On information and belief, many other women—both in and outside of the entertainment industry—have suffered actual and threatened reputational and professional harm (in addition to physical and emotional harm) because Weinstein maliciously targeted them and sought to sabotage

---

[14] https://www.newyorker.com/news/news-desk/weighing-the-costs-of-speaking-out-about-harvey-weinstein

[15] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories

[16] http://www.vulture.com/2017/12/peter-jackson-weinstein-smeared-ashley-judd-mira-sorvino.html

Gibson, Dunn & Crutcher LLP

1    their careers.  On information and belief, Weinstein's egregious harassing acts, as well as the harm

2    caused thereby, continued as part of a well-established pattern through at least October 2017.[17]

3    The experiences of these women—which California courts describe as "me too" evidence—further

4    demonstrate Weinstein's misconduct and bad intent.

5        23.    Ambra Battilana Gutierrez's experience also provides direct evidence of Weinstein's

6    continued pattern and practice of abusing and threatening women.  Specifically, a recording reported

7    to have been part of a March 2015 New York Police Department sting operation includes an

8    exchange between Weinstein and then 22-year-old Ms. Gutierrez, who accused Weinstein of groping

9    her breasts in what she thought was a business meeting.  In the recording, reportedly from the bar of

10   the Tribeca Grand Hotel, Ms. Gutierrez asks, "Why yesterday you touch my breast?"  Weinstein

11   responds, "Oh, please.  I'm sorry.  Just come on in.  *I'm used to that*."  Ms. Gutierrez asks,

12   incredulously, "You're used to that?"  Weinstein responds, "Yes, come in."  At another point in the

13   recording, Weinstein boasts, "*I'm a famous guy*," and, after having instructed Ms. Gutierrez to

14   "get in here," orders her to "come here now."  He then warns:  "*Five Minutes.  Don't ruin your*

15   *friendship with me for five minutes*."[18]

16   **C.   Weinstein Targets Ms. Judd.**

17       24.    Against this backdrop, Ms. Judd's experience sounds eerily familiar.  In or around late

18   1996 or early 1997, Weinstein invited Ms. Judd—at that point, in her twenties and still a relative

19   newcomer to Hollywood—to a breakfast meeting at the Peninsula Hotel in Beverly Hills, ostensibly

20   to discuss potential roles in films.  On information and belief, during this period, Weinstein regularly

21   stayed at the Peninsula Hotel when in Los Angeles County on business.  When Ms. Judd arrived, she

22   was directed not to the dining room or a conference room, but to Weinstein's private hotel room.

23   Assuming the business meeting was to occur, she went to the room.  At that time, Weinstein was a

24   dominant figure in the film business and the gatekeeper to many desirable roles and film projects.

25

26   ─────────────────

27   [17]  The accounts described herein are not comprehensive and are in no way meant to suggest that
     some women's experiences with Weinstein are to be valued or credited more than others.

28   [18]  http://www.newsweek.com/full-transcript-harvey-weinstein-accuser-tried-turn-down-his-
     advances-12-times-681711

Gibson, Dunn &
Crutcher LLP

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

1  Ms. Judd rightfully believed that alienating or offending him could damage her career. As an actor

2  trying to build a reputation and establish herself in Hollywood, she had little choice but to engage

3  with the powerful and influential film producer and distributor.

4      25.    When Ms. Judd arrived at the room, Weinstein appeared in a bathrobe, and, instead of

5  discussing film roles, asked if he could give her a massage. She refused. He asked her to help him

6  pick out clothes and to watch him shower. She refused again. There was no one else in the room and

7  no way for someone to come in to help her because the door was locked to the outside. Ms. Judd

8  reasonably believed that Weinstein intended to physically assault her. Cornered, and desperate to

9  escape without angering a man who had the ability to end her budding career, Ms. Judd engaged in a

10  mock bargain with Weinstein, suggesting that she would consider letting him touch her only if she

11  won an Academy Award in one of his films. Weinstein responded: "when you get nominated."

12  Ms. Judd held firm, saying, "No, when I win." And then she fled the scene.[19]

13      26.    Immediately after exiting Weinstein's room, Ms. Judd went straight downstairs to the

14  hotel lobby, where her father, who happened to be visiting from Kentucky, was waiting for her.

15  Upon seeing Ms. Judd, her father told her that she looked like something "devastating" had happened

16  to her.[20] Ms. Judd then told her father what Weinstein had done only minutes earlier. She repeated

17  the story to her mother not long after.

18      27.    After that day, Weinstein would continue to lord that traumatic moment over Ms. Judd,

19  telling her at several public Hollywood events something to the effect that he "remembered their

20  agreement." Weinstein's conduct was so egregious as to fundamentally alter the professional

21  relationship between Weinstein and Ms. Judd.

22  **D.    Weinstein Retaliates Against Ms. Judd.**

23      28.    A year or so after Weinstein cornered her at the Peninsula Hotel, Ms. Judd, whose star had

24  been rising following the release of the 1997 thriller *Kiss the Girls*, was in serious discussions to play

25

26

27  [19]  http://nationalpost.com/entertainment/celebrity/ashley-judd-says-a-deal-helped-her-flee-from-weinstein

28  [20]  http://www.vulture.com/2017/12/why-ashley-judd-went-on-the-record-about-harvey-weinstein.html

Gibson, Dunn & Crutcher LLP

11

a major role in a trio of upcoming films to be directed by Peter Jackson: specifically, *The Lord of the Rings*. In or around 1998, Mr. Jackson and his partner, Fran Walsh, invited Ms. Judd to a private meeting in Los Angeles County. During that meeting, they showed Ms. Judd their ideas for the film, the story boards, the costumes—essentially, their entire vision for how the film would be executed. Giving an actor this rare creative insight into such an eagerly anticipated and secretive project demonstrated that Ms. Judd was at an advanced stage of the casting process. Mr. Jackson and Ms. Walsh then asked Ms. Judd which of two potential roles she most identified with and which she would prefer. On information and belief, they liked Ms. Judd very much and intended to cast her in their films, which were set to begin principal photography in or around October 1999.

29.     During the meeting, Mr. Jackson and/or Ms. Walsh told Ms. Judd that they had had a similar meeting with actor Viggo Mortensen, who also was in serious discussions to play a major role in the *Lord of the Rings* films. Shortly after her meeting with Mr. Jackson and Ms. Walsh, Ms. Judd spoke with Mr. Mortensen, whose choice of film projects she respected, about whether he would accept the role and be willing to move to New Zealand to shoot the films. After he explained his thinking to her, Ms. Judd also made up her mind to go to New Zealand to shoot the films. Mr. Mortensen ultimately appeared in all three films in the *Lord of the Rings* series.

30.     At this point, on information and belief, Weinstein's production company, Miramax, still held the rights to the *Lord of the Rings* films. Thus, not long after the 1998 meeting with Ms. Judd in Los Angeles County, Mr. Jackson and/or Ms. Walsh expressed their enthusiasm for casting Ms. Judd in *The Lord of the Rings* to Miramax and Weinstein. By this time, Weinstein had spent well over a year actively involved in casting discussions for the films, among other things. As Mr. Jackson stated in a December 2017 interview, Miramax (*i.e.*, Weinstein) told him and Ms. Walsh, in confidence, that Ms. Judd—and Ms. Sorvino, whom Mr. Jackson and Ms. Walsh were considering for a different role in the films—were "a nightmare to work with and [that Mr. Jackson and Ms. Walsh] should avoid them at all costs."[21] As Mr. Jackson noted in a subsequent statement, Miramax also claimed to have

---

[21] https://www.stuff.co.nz/entertainment/99921399/sir-peter-jackson-harvey-weinstein-made-me-blacklist-stars

Gibson, Dunn &
Crutcher LLP

had "'bad experiences'" with the two actors in the past.[22]  On information and belief, Mr. Jackson and Ms. Walsh contemporaneously relayed these disparaging statements about Ms. Judd (and Ms. Sorvino) to at least one other individual, a co-collaborator and business partner, who was also involved in casting decisions for *The Lord of the Rings*.

31.    These statements of purported fact, made by Weinstein, were false.  At that time, Ms. Judd had worked on a single Miramax film, *Smoke*, in 1995, and spent approximately two days on set in a limited role.  Ms. Judd does not recall any professional interactions with Weinstein or any other Miramax producer in connection with that film, and her experience was uniformly positive. In fact, years later, Weinstein cast Ms. Judd in two separate films, *Frida* (2002), and *Crossing Over* (2009), and his authorized representative claimed in December 2017 that at one point, Ms. Judd had been "the top choice for Miramax and Mr. Weinstein" to play a major role in *Good Will Hunting* (1998).[23]  The malicious statements of purported fact that Weinstein made to Mr. Jackson and Ms. Walsh about Ms. Judd were knowingly false and falsely implied that Weinstein knew negative facts about Ms. Judd's professionalism and work conduct.  In fact, there was no "bad experience" to speak of.

32.    On information and belief, these false statements were made knowing that they would disrupt Ms. Judd's relationship with Mr. Jackson and Ms. Walsh.  On information and belief, as a direct result of these statements, Mr. Jackson and Ms. Walsh did not cast Ms. Judd in the *Lord of the Rings* films or in any of their subsequent films because they had been told that Ms. Judd would act unprofessionally and cause problems on set.  On information and belief, although the statements about Ms. Judd did not fit with the impression Mr. Jackson and Ms. Walsh had gained during their meeting with Ms. Judd, they believed the statements were genuine.  As Weinstein knew, the negative facts expressed and implied about Ms. Judd made it more likely she would not be cast and were particularly salient under the circumstances:  An actor who was a "nightmare to work with" would

---

[22]  https://apnews.com/4a8590d6a62848c4a61ba4676827f16a/Peter-Jackson's-Weinstein-story-opens-old-wounds-for-Sorvino

[23]  https://www.thewrap.com/harvey-weinstein-fires-back-peter-jackson-ashley-judd-mira-sorvino-backlash/

Gibson, Dunn & Crutcher LLP

1   have been particularly problematic for a high-stakes, multi-part production like *The Lord of the*

2   *Rings*, filming for months on location in New Zealand thousands of miles from the actor's home.

3       33.   On information and belief, New Line eventually obtained the rights to the *Lord of the*

4   *Rings* films from Miramax.  On information and belief, if Mr. Jackson and Ms. Walsh had

5   recommended to New Line that Ms. Judd be cast in the films, New Line would have agreed.

6   Moreover, with the clout they gained through the extreme success of *The Lord of the Rings*, it is

7   further alleged, on information and belief, that Mr. Jackson and Ms. Walsh had the power to

8   unilaterally decide to cast Ms. Judd in one of their subsequent films, such as the three films in

9   *The Hobbit* trilogy, which included at least one of the roles for which Ms. Judd had been considered

10  in the *Lord of the Rings* films.  But for Weinstein's false statements and malicious interference

11  (which he sought to conceal through Miramax), Ms. Judd alleges, on information and belief, that

12  Mr. Jackson and Ms. Walsh would have done so.

13      34.   Ms. Judd would have realized the economic advantage of working on *The Lord of the*

14  *Rings* and/or other films with Mr. Jackson and Ms. Walsh but for Weinstein's malicious interference.

15  The false statements he made to Mr. Jackson and Ms. Walsh were motivated by a desire to retaliate

16  against Ms. Judd for rejecting his unwanted sexual overtures and were intended to cause Ms. Judd

17  professional harm.

18      35.   Until December 2017, Ms. Judd did not know why she was not cast in the *Lord of the*

19  *Rings* films.  Given her prior experience in the film industry, Ms. Judd reasonably believed that

20  asking Mr. Jackson and Ms. Walsh why she was removed from consideration would have risked

21  alienating them and negatively affected their willingness to consider her for future projects.

22  On information and belief, even if Ms. Judd had asked Mr. Jackson and Ms. Walsh why they

23  removed her from consideration for *The Lord of the Rings*, they would not have disclosed the

24  statements Weinstein made about her, given that those statements were made in confidence.

25  Further, doing so would have risked damaging their own relationship with the powerful producer,

26  film distributor, and owner of rights to a percentage of profits in *The Lord of the Rings*.

27      36.   The *Lord of the Rings* films went on to earn more than $2.5 billion in global ticket sales

28  and were nominated for 30 Academy Awards, ultimately winning 17, including Best Picture,

1   Best Director, and Best Adapted Screenplay wins for the third film, *The Lord of the Rings: Return of*

2   *the King* (2003). Those three films were followed in 2012 by the film trilogy *The Hobbit* (based on

3   the J.R.R. Tolkien novel of the same name), which was also directed by Mr. Jackson and grossed

4   nearly $1 billion worldwide. On information and belief, because of the statements Weinstein made

5   about Ms. Judd, Mr. Jackson and Ms. Walsh did not consider her for a role in *The Hobbit* films.

6         37.    On information and belief, at the time Weinstein made false statements about Ms. Judd

7   and Ms. Sorvino, Mr. Jackson and Ms. Walsh had no knowledge of Weinstein's predatory behavior

8   toward women or his pattern of retaliating against those who refused him. Nor were they aware of

9   Ms. Judd's prior encounter with Weinstein at the Peninsula Hotel in Beverly Hills.

10         38.    Years later, and shortly after reading the accounts of numerous women (including

11   Ms. Judd) naming Weinstein as the perpetrator of years of harassing and abusive conduct,

12   Mr. Jackson recalled the statements about Ms. Judd and began to question their veracity. In a

13   December 2017 interview, Mr. Jackson revealed that he and Ms. Walsh had chosen not to pursue the

14   casting of Ms. Judd as a direct result of the statements Weinstein, directly and through Miramax,

15   had made about her professionalism as an actor. As Mr. Jackson explained, "[a]t the time, we had no

16   reason to question what [Miramax was] telling us – but in hindsight, I realise that this was very likely

17   the Miramax smear campaign in full swing. I now suspect we were fed false information about both

18   of these talented women [*i.e.*, Ms. Judd and Ms. Sorvino], and *as a direct result* their names were

19   removed from [*The Lord of the Rings*] casting list."[24] It was only after this interview was published

20   that Ms. Judd learned that Weinstein's conduct was the reason why she had not been cast in the

21   *Lord of the Rings* films.

22         39.    On or about December 16, 2017, Weinstein's authorized representative made a public

23   statement in response to Mr. Jackson's account. Weinstein's authorized representative *did not* defend

24   the truth of the statements or state that Weinstein believed them to be true. Instead, the authorized

25   representative claimed that Weinstein "had no input into the casting whatsoever." Weinstein (again,

26

27

28     [24]  https://www.stuff.co.nz/entertainment/99921399/sir-peter-jackson-harvey-weinstein-made-me-blacklist-stars

through his authorized representative) even noted that Ms. Judd "was cast in two other films by Mr. Weinstein." As for Ms. Sorvino, she "was always considered for other films as well."[25] In a follow-up statement, Weinstein's authorized representative doubled down, stating that "[a]round the time of *Rings*, Mr. Weinstein cast Ms. Judd in *Frida* and years later, in *Crossing Over*." Weinstein (through his authorized representative) added, "Miramax had flown Ashley to New York for casting discussions and to meet the production team for *Good Will Hunting*," further claiming that "Ashley was the top choice for Miramax and Mr. Weinstein."[26]

40.    By his own authorized public statements, then, Weinstein has conceded the falsity of any claim that Ms. Judd was a "nightmare" to work with, that she should be "avoided at all costs," or that Weinstein or Miramax had had a "bad experience" with her.  The only dispute appears to be whether Weinstein, directly or through Miramax, in fact said those things to Mr. Jackson and Ms. Walsh. Mr. Jackson has said in a published rebuttal to Weinstein that Miramax did make those statements, and that Ms. Walsh "remembers these negative comments about Ashley and Mira as clearly as I do."[27] Weinstein—who has said, "*I came of age in the 60's and 70's, when all the rules about behavior and workplaces were different*"—claims he did not make the specious claims about Ms. Judd.[28] Ms. Judd is eager to have a jury decide whom to believe.

41.    Indeed, another telling statement offered by Weinstein (through his authorized representative) in December 2017 was, "*After the success of* Lord of the Rings, *Peter Jackson was so powerful he could have cast anyone he wanted in the* Hobbit. *Neither Ms. Judd nor Ms. Sorvino had roles in the film.*"[29] Ms. Judd could not say it better herself: Weinstein's smears blocked Ms. Judd from working with the director gifted with what Weinstein himself called

---

[25]  http://ew.com/movies/2017/12/15/peter-jackson-weinstein-smear-mira-sorvino-ashley-judd/

[26]  https://www.thewrap.com/harvey-weinstein-fires-back-peter-jackson-ashley-judd-mira-sorvino-backlash/

[27]  http://deadline.com/2017/12/peter-jackson-rebukes-harvey-weinsteins-ashley-judd-mira-sorvino-lord-of-the-rings-1202228217/

[28]  https://www.nytimes.com/interactive/2017/10/05/us/statement-from-harvey-weinstein.html

[29]  https://www.thewrap.com/harvey-weinstein-fires-back-peter-jackson-ashley-judd-mira-sorvino-backlash/

1   "creative genius."  Mr. Jackson could have cast Ms. Judd in *The Hobbit* films, but on information and

2   belief, he did not even consider her *because of* the false statements Weinstein made about her

3   professionalism and Miramax's purported "bad experience" with her.  These false statements

4   of course denied Ms. Judd the significant opportunity to work with Mr. Jackson on one of his films.

5   They also denied her all the opportunities she would have had with other filmmakers going forward if

6   she had worked on one of Mr. Jackson's successful and critically acclaimed projects.

7        42.    Weinstein's ongoing attempts to discredit his accusers by putting forward photographs

8   showing him and those accusers together in public further supports Ms. Judd's claims.  Weinstein

9   apparently intends to suggest that he could not have assaulted, made unwanted advances toward, or

10  threatened the women who then appeared in photographs with one of Hollywood's most powerful

11  gatekeepers to the creation and casting of the films in which they worked.  The photographs include

12  one of Ms. Judd, taken in or around 1997 after the encounter at the Peninsula Hotel, that Weinstein

13  apparently provided to ABC News.  In the photograph, Weinstein smiles as he clasps Ms. Judd's

14  wrist at a public event.  Far from being exculpatory, this photograph—along with another showing

15  Weinstein pressing himself against Ms. Judd while bending back her arm—reflects the size

16  advantage Weinstein had over Ms. Judd.  It also reflects that Ms. Judd was too scared to make a

17  scene at a public Hollywood gathering when standing next to the self-proclaimed "godfather" of a

18  new film movement, a man who socialized with U.S. presidents and held the fate of film projects—

19  and the livelihoods of actors who worked on them—in his hands.  Weinstein, for his part, is all smiles

20  and gives no indication at all that he believed Ms. Judd was a "nightmare" to work with whom

21  filmmakers should avoid "at all costs."

22

23

24

25

26

27

28

### E.   Weinstein Benefitted Financially from His Misconduct.

43.   On information and belief, Weinstein's compensation from the 1990s through October 2017 was affected by the financial performance of Miramax and The Weinstein Company.  The higher the profits, the more compensation for Weinstein.  On information and belief, the less that Miramax or The Weinstein Company paid actors for their services, the better the financial results of those companies and the greater the financial benefit for Weinstein.

44.   Weinstein's blacklisting of actors to other filmmakers and/or studios was retaliatory conduct in the context of the actors' professional relationships with Weinstein.  While his egregious behavior harmed the actors' careers, it had the ancillary benefit for Weinstein of increasing his power over those actors.  It was also profitable, because he (and his companies) could pay the actors less for their services.

45.   A significant factor in the negotiation of an actor's compensation for a film role is "precedent"—that is, what she has been paid for past projects.  This precedent, typically called the actor's "quote," is also affected by the success of the film project.  On information and belief, if Ms. Judd had had a major role in a multi-billion-dollar film franchise, that would have increased her quote (in which she had a vested interest).  It would have given her increased bargaining power for future projects and it would have increased the amount of money for which she could negotiate to act in future films (including films produced or distributed by Weinstein's companies).  Weinstein knew that.  On information and belief, Weinstein's clandestine actions to interfere with actors' abilities to get other roles enabled Weinstein and his companies to pay less money for the actors' services than they otherwise would have had to pay.  That is true for Ms. Judd as well:  as a result of Weinstein's actions, he obtained her acting services in two subsequent films—*Frida* and *Crossing Over*—at a lower quote than he would have otherwise had to pay.  Weinstein thereby obtained ill-gotten gains at Ms. Judd's expense.

46.   While Weinstein profited, actors like Ms. Judd and Ms. Sorvino, who were thwarted in their efforts to be cast in career-defining or other roles, can never fully be made whole for those lost opportunities.  They lost out on higher salaries, residuals, public exposure, more professionally and financially rewarding opportunities, and other tangible and intangible benefits.  The same is true of

1   other actors who may have had no other choice but to accept a role on a Weinstein film because

2   Weinstein or his agents had dissuaded other studios and filmmakers from hiring them.  Weinstein's

3   retaliatory misconduct increased the actors' dependence on him for work.  On information and belief,

4   Weinstein intended for this dependence to increase the likelihood that the actors who resisted him

5   would give in to his sexual demands.

6   **F.      Weinstein Remains a Threat to Women.**

7        47.      Weinstein has openly claimed that "if he makes enough progress," he wants to "be given a

8   second chance."  Weinstein thus has indicated that he intends to return to Hollywood and to resume

9   his work in the entertainment industry.  His pattern of abusive, threatening, and retaliatory conduct

10   remains a danger to women generally and to actors like Ms. Judd in particular.

11

12                          **FIRST CAUSE OF ACTION**

13               **(Defamation at Common Law and Civ. Code, § 46 –**

14                 **Slander, False and Unprivileged Publications)**

15        48.      Ms. Judd incorporates by reference all preceding allegations as though fully set forth

16   herein.

17        49.      In telling and causing Mr. Jackson and Ms. Walsh to be told in a private conversation that

18   Ms. Judd was "a nightmare to work with," should be "avoid[ed] at all costs," and that Miramax had a

19   "bad experience" with Ms. Judd in the past, Weinstein expressed and caused Miramax to express

20   purportedly factual statements about Ms. Judd and implied that there was a factual basis to evaluate

21   Ms. Judd's work style and professionalism.

22        50.      On information and belief, Weinstein intentionally communicated these specific

23   statements about Ms. Judd to Mr. Jackson and Ms. Walsh.

24        51.      On information and belief, Mr. Jackson and Ms. Walsh understood these statements to

25   refer to Ms. Judd, and specifically, to mean that Ms. Judd would be an ill-advised casting choice for

26   the *Lord of the Rings* films and should not be selected for any role in those films, or any other film.

27        52.      The private statements Weinstein made to Mr. Jackson and Ms. Walsh concerning

28   Ms. Judd were false.  At the time these statements were made (in or around 1998), Weinstein's

1  professional connection to Ms. Judd consisted of serving as an executive producer on *Smoke*, the sole

2  Miramax film in which she had appeared.  Ms. Judd had had a uniformly positive experience in a

3  small role in that film and no professional interactions with Weinstein or any other producer.  There

4  was no factual basis to tell Mr. Jackson and Ms. Walsh that Ms. Judd was a "nightmare to work

5  with," that she should be avoided "at all costs" or that Miramax had had a "bad experience" with her.

6  These statements themselves are express false statements of fact, and they falsely implied a

7  knowledge of negative facts about Ms. Judd's professionalism and ability to work with others.

8  Ms. Judd did not have a "bad experience" with Miramax or Weinstein.  There was likewise no factual

9  basis to say that Ms. Judd worked poorly with others or that her involvement would cause problems

10  for a film project.  The statements about Ms. Judd were complete fiction, crafted to seem credible and

11  to cause maximum damage.  Notably, Ms. Judd was subsequently cast in two Miramax films (*Frida*

12  and *Crossing Over*)—demonstrating the falsity of the statements and Weinstein's bad faith in making

13  them and causing them to be made.  In fact, Weinstein ***admits*** that the statements attributed to him

14  are false; he only denies making them. . .

15  53.  Weinstein made the above-described defamatory statements with actual malice—*i.e.*, with

16  knowledge of their falsity, or, alternatively, with a reckless disregard for their falsity.

17  54.  Weinstein made these statements without privilege or justification.

18  55.  The above-described statements concerning Ms. Judd directly injured her by diminishing

19  her reputation in her profession, trade, and/or business, which has a natural tendency to lessen her

20  profits.

21  56.  The above-described statements convey a defamatory meaning.  They harm Ms. Judd's

22  reputation as to lower it.

23  57.  It was Weinstein's expectation and intent that the defamatory statements would injure

24  Ms. Judd economically, including by lessening her profits.

25  58.  As a result of the publication of these false and defamatory statements with actual malice,

26  Ms. Judd was not selected for a role in the *Lord of the Rings* films or any of Mr. Jackson's and

27  Ms. Walsh's other film projects.  Ms. Judd has suffered damages including but not limited to lost

28  compensation, lost profits, loss to reputation, and increased costs.  These damages are not limited to

the lost opportunity to work with Mr. Jackson and Ms. Walsh.  Rather, they include all the other opportunities that Ms. Judd would have had to work on other projects with other filmmakers but for Weinstein's wrongful conduct, which had a long-lasting ripple effect on Ms. Judd's career trajectory as a whole.

59.     Ms. Judd did not discover, and had no reason to discover, what Mr. Jackson and Ms. Walsh had been told in confidential business discussions regarding a valuable film project until Mr. Jackson revealed in December 2017 that Miramax (*i.e.*, Weinstein) had convinced Mr. Jackson and Ms. Walsh not to work with Ms. Judd, and that they did not cast her as a result of the statements Weinstein made.

60.     Weinstein also acted with oppression, fraud, or malice as defined by California Civil Code section 3294 and engaged in highly reprehensible and despicable conduct warranting exemplary damages.

## SECOND CAUSE OF ACTION

### (Civ. Code, §§ 51.9 and 52 – Sexual Harassment in Professional Relationships)

61.     Ms. Judd incorporates by reference all preceding allegations as though fully set forth herein.

62.     Ms. Judd, an actor, was in a business, service, or professional relationship with Weinstein, a film producer and distributor.  At the time of the harassment, she was actively seeking acting roles in films.  In fact, she had previously worked on a 1995 film produced by Miramax (on which Weinstein was an executive producer) and, at the time of the harassment, was discussing potential roles in films produced or distributed by Weinstein or Miramax.  Weinstein was the gatekeeper to those roles and controlled Ms. Judd's access to them.  Ms. Judd's business relationship with Weinstein was also ongoing, as evidenced by the fact that she was cast in two subsequent Miramax films in 2002 and 2009.

63.     In or around late 1996 or early 1997, Weinstein harassed Ms. Judd, including by making sexual advances, solicitations, sexual requests, or demands for sexual compliance toward her in a

1  hotel room at the Peninsula Hotel in Beverly Hills, where he had lured her under the guise of

2  discussing potential roles in films.

3      64.      Weinstein's sexual advances, solicitations, requests, threats, and demands for sexual

4  compliance toward Ms. Judd were unwelcome and severe, as indicated by her refusals to acquiesce to

5  those demands and her immediate disclosure of those demands to her father and mother.  Ms. Judd

6  reasonably feared for her safety in the locked hotel room, and Weinstein's conduct and statements

7  constituted a threat of physical assault.

8      65.      Because of Weinstein's uniquely powerful role in the industry in which Ms. Judd worked,

9  the prior working relationship between Ms. Judd and Miramax (the film company controlled by

10  Weinstein), and Ms. Judd's relative lack of power and access as a young newcomer to Hollywood,

11  she was unable to easily end the relationship with Weinstein.  Indeed, Ms. Judd continued to have a

12  business relationship with Weinstein, as evidenced by the fact that she was cast in two subsequent

13  Miramax films in 2002 and 2009.

14      66.      Weinstein's conduct was so egregious as to fundamentally and permanently alter the

15  condition of the professional relationship between Weinstein and Ms. Judd.

16      67.      As a result of Weinstein's acts—and Ms. Judd's refusal to acquiesce to his improper

17  demands—Ms. Judd suffered harm, including but not limited to economic injury.  Among other

18  things, Weinstein falsely told Mr. Jackson and Ms. Walsh that Ms. Judd was a "nightmare" to work

19  with, should be avoided "at all costs," and that Miramax had a "bad experience" with Ms. Judd.  As a

20  result of these false statements, on information and belief, Mr. Jackson and Ms. Walsh terminated

21  their efforts to cast Ms. Judd in what became a multi-billion-dollar, award-winning film franchise.

22  Ms. Judd consequently was wrongfully deprived of compensation she would have received from

23  working on the films, compensation she would have received from working on any subsequent films

24  with Mr. Jackson and Ms. Walsh, and compensation she would have received from other studios

25  (including Weinstein's) in connection with other film projects if she had been a part of the *Lord of*

26  *the Rings* franchise and its worldwide acclaim and financial success.

27      68.      Because Ms. Judd refused to submit to Weinstein's sexual demands, he fabricated facts

28  about her and communicated them to Mr. Jackson and Ms. Walsh in order to convince Mr. Jackson

1    and Ms. Walsh not to work with Ms. Judd.  In doing so, Weinstein intended to, and did, retaliate

2    against Ms. Judd by damaging her professionally.

3          69.      Ms. Judd did not discover, and had no reason to discover, what Mr. Jackson and

4    Ms. Walsh had been told in confidential business discussions regarding a valuable film project until

5    Mr. Jackson revealed in December 2017 that Miramax had convinced him and Ms. Walsh not to

6    work with Ms. Judd, and that they did not cast her as a direct result of the statements Weinstein

7    made.

8          70.      Until December 2017, Ms. Judd thus did not discover, and had no reason to discover, that

9    Weinstein in fact had retaliated against her for refusing to submit to his sexual demands.

10         71.      Weinstein also acted with oppression, fraud, or malice as defined by California Civil Code

11    section 3294 and engaged in highly reprehensible and despicable conduct warranting exemplary

12    damages.

13         72.      As a result of this unlawful conduct, Ms. Judd is entitled to actual damages and exemplary

14    damages pursuant to California Civil Code section 52, subdivision (b)(1), in an amount to be awarded

15    at trial.

16

17                              **THIRD CAUSE OF ACTION**

18            **(Intentional Interference with Prospective Economic Advantage)**

19          73.      Ms. Judd incorporates by reference all preceding allegations as though fully set forth

20    herein.

21         74.      Ms. Judd had an existing economic relationship with Mr. Jackson and/or Ms. Walsh.

22    In 1998, Ms. Judd was in ongoing talks with Mr. Jackson and Ms. Walsh to be cast in one of two

23    roles in the *Lord of the Rings* films, which ultimately earned billions of dollars at the box office.

24    Her name had been added to a casting list, and on information and belief, had Weinstein not

25    convinced Mr. Jackson and Ms. Walsh not to cast Ms. Judd, they would have recommended that she

26    be cast in the films.  Given these discussions, it is reasonably probable that, but for the statements

27    Weinstein made to Mr. Jackson and Ms. Walsh, Ms. Judd would have been cast in the films and

28    obtained an economic benefit.

75. Due to Miramax's and Weinstein's personal involvement with the *Lord of the Rings* films, and because Mr. Jackson and Ms. Walsh expressed their desire to cast Ms. Judd in the films, Weinstein knew of the prospective relationship between Ms. Judd, on the one hand, and Mr. Jackson, and/or Ms. Walsh, on the other hand.

76. Weinstein intentionally and wrongfully interfered with this prospective, beneficial economic relationship by communicating and causing false statements of fact to be communicated to Mr. Jackson and Ms. Walsh about Ms. Judd's work as an actor. In doing so, Weinstein intended to disrupt Ms. Judd's prospective economic advantage or knew that his actions were certain or substantially certain to achieve this result.

77. Weinstein's actions were independently wrongful and were proscribed by the following legal standards, including but not limited to:

   a. Common-law defamation and defamation under California Civil Code section 46;

   b. California Civil Code sections 51.9 and 52, which prohibit sexual harassment in professional relationships; and

   c. California Business and Professions Code section 17200 *et seq.*

78. Weinstein's actions were intentionally undertaken to inflict harm on Ms. Judd by impairing her work in her profession and business, and specifically, interfering with her relationship with Mr. Jackson and Ms. Walsh.

79. Weinstein's acts, including the statements he made to Mr. Jackson and Ms. Walsh, resulted in an actual disruption of the beneficial economic relationship referenced above.

80. Ms. Judd did not discover, and had no reason to discover, what Mr. Jackson and Ms. Walsh had been told in confidential business discussions regarding a valuable film project until Mr. Jackson revealed in December 2017 that Miramax had convinced him and Ms. Walsh not to work with Ms. Judd, and that they did not cast her as a direct result of the statements Weinstein made.

81.     Weinstein also acted with oppression, fraud, or malice as defined by California Civil Code section 3294 and engaged in highly reprehensible and despicable conduct warranting exemplary damages.

82.     As a proximate result of Weinstein's intentional interference with the aforementioned prospective economic relationships, Ms. Judd has suffered (and will continue to suffer) actual, consequential, and/or incidental damages, in the form of lost profits, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Violation of Bus. & Prof. Code, § 17200 *et seq.* (Unfair Competition Law))

83.     Ms. Judd incorporates by reference all preceding allegations as though fully set forth herein.

84.     The Unfair Competition Law ("UCL") prohibits any unlawful, unfair, and fraudulent business acts and practices.

85.     Weinstein has violated (and continues to violate) the UCL by engaging in the following unlawful acts and practices:

        a.      Maliciously defaming Ms. Judd with respect to her profession, trade, and/or business in violation of California Civil Code section 46 and under the common law;

        b.      Engaging in a pattern of retaliatory conduct linked to sexual harassment against Ms. Judd and others in violation of California Civil Code sections 51.9 and 52; and

        c.      Intentionally interfering with Ms. Judd's prospective economic relationship with a business contact, to wit, Mr. Jackson and/or Ms. Walsh.

86.     Weinstein has violated (and continues to violate) the UCL by engaging in the following unfair business acts and practices:

        a.      Engaging in retaliatory harassing and malicious defamatory conduct, which provides no benefit to competition, such that Ms. Judd and other actors have been substantially injured in their professions and careers;

b. Engaging in harassing and malicious defamatory conduct such that Weinstein gains an unfair advantage over lawfully competing competitors, including but not limited to paying actors lower wages than he would otherwise have been required to do, and diminishing the actors' leverage and earning potential for future roles;

c. Implementing practices for the deliberate purpose of depriving actors of opportunities on an industrywide basis; and

d. Engaging in harassing and malicious defamatory conduct in violation of public policy as reflected in California Civil Code sections 46, 51.9, and 52.

87. Weinstein indisputably profited from lower compensation costs as a result of his own acts of unfair competition against Ms. Judd.

88. Ms. Judd did not discover, and had no reason to discover, what Mr. Jackson and Ms. Walsh had been told in confidential business discussions regarding a valuable film project until Mr. Jackson revealed in December 2017 that Miramax had convinced him and Ms. Walsh not to work with Ms. Judd, and that they did not cast her as a direct result of the statements Weinstein made.

89. As a result of these acts, Ms. Judd was not selected for a role in the *Lord of the Rings* films or any of Mr. Jackson's and Ms. Walsh's other film projects. Ms. Judd has suffered damages including but not limited to lost profits, loss to reputation, and increased costs.

90. Weinstein gained an economic benefit as a result of the unlawful and unfair practices complained of herein, including but not limiting to lowering Ms. Judd's "quote." As a result of Weinstein's unlawful and unfair practices, he obtained Ms. Judd's acting services in the two Miramax films in which she subsequently appeared (*Frida* and *Crossing Over*) at a lower rate than he would have had to pay but for his unlawful and unfair practices. Ms. Judd has a vested interest in the higher quote she should have been paid for the work she performed on those films.

91. Ms. Judd has no adequate remedy at law for the injuries that she will continue to suffer as a result of Weinstein's unlawful acts.

92. Unless restrained by this Court, Weinstein will continue to pursue his campaign of unfair and unlawful conduct, including but not limited to using his pattern of abusive and harassing

behavior to exert control over the professional careers of Ms. Judd and other actors, and to limit their wages and earnings.

### **PRAYER FOR RELIEF**

WHEREFORE, Ms. Judd respectfully prays for the following:

A.   Damages, including general and special damages, in an amount to be determined at trial;

B.   Punitive damages;

C.   Restitutionary disgorgement;

D.   An order enjoining Weinstein from engaging in further retaliatory conduct toward Ms. Judd;

E.   An injunction requiring Weinstein to cease engaging in unfair competition;

F.   Prejudgment interest;

G.   Costs to the extent provided for by law, including attorney's fees as provided by statute; and

H.   An order awarding Ms. Judd such other and further relief as the Court deems just and proper.


DATED: April 30, 2018

GIBSON, DUNN & CRUTCHER LLP

By: _____
     Theodore J. Boutrous, Jr.

Attorneys for Plaintiff Ashley Judd

## **DEMAND FOR JURY TRIAL**

Plaintiff Ashley Judd demands a jury trial of all triable issues.

DATED: April 30, 2018

GIBSON, DUNN & CRUTCHER LLP

By: _____
         Theodore J. Boutrous, Jr.

Attorneys for Plaintiff Ashley Judd

102451449.10

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

Gibson, Dunn &
Crutcher LLP