THEODORE J. BOUTROUS, JR., SBN 132099
  tboutrous@gibsondunn.com
THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
MICHAEL H. DORE, SBN 227442
  mdore@gibsondunn.com
LAUREN M. BLAS, SBN 296823
  lblas@gibsondunn.com
LORI C. ARAKAKI, SBN 315119
  larakaki@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Attorneys for Plaintiff
ASHLEY JUDD

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHLEY JUDD, an individual,<br><br>Plaintiff,<br><br>v.<br><br>HARVEY WEINSTEIN, an individual,<br><br>Defendant. | CASE NO. 18-cv-05724 PSG (FFMx)<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**<br><br>**(1) DEFAMATION AT COMMON LAW AND PURSUANT TO CIV. CODE, § 46**<br><br>**(2) SEXUAL HARASSMENT UNDER CIV. CODE, §§ 51.9 AND 52**<br><br>**(3) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br><br>**(4) VIOLATION OF BUS. & PROF. CODE, § 17200, ET SEQ. (UNFAIR COMPETITION LAW)**<br><br>**(5) INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Ashley Judd hereby alleges the following against Defendant Harvey Weinstein ("Weinstein"):

## SUMMARY OF ACTION

For many people, film is a form of entertainment.  But for some, it is their business.  Writers, cinematographers, grips, make-up artists, directors, and actors are just some of the people whose livelihoods involve the creation of films for people around the world to watch and enjoy.  Ashley Judd is one of the people who makes a living in this industry.  She is a film, television, and stage actor by trade and has been a member of the actors' union for more than 25 years.  Acting is a unique job that offers incredible opportunities for creative and personal fulfillment.  But it is still a job.  And like any professional, an actor like Ms. Judd must rely on her experience and her reputation to find work in the face of fierce competition.

What Ms. Judd did not know until December 2017 was that something unseen was holding her back from obtaining the work she wanted, and had been doing so for decades.  The headwind limiting her career was Harvey Weinstein, and specifically, the false and malicious statements he made regarding Ms. Judd's professionalism as an actor to the creative team behind the blockbuster film trilogy *The Lord of the Rings* (also referred to as "*Lord of the Rings*"), and several international hits that followed.  That creative team, consisting of director Peter Jackson and his production partner Fran Walsh, met with Ms. Judd in Los Angeles County in or around 1998 to discuss playing one of two different major roles in the film trilogy.  They shared confidential creative details about the films with her and indicated that she could choose which role she wanted to play.  Mr. Jackson and Ms. Walsh then told Weinstein's company, Miramax, which owned the rights to *The Lord of the Rings* at the time, that they wanted to cast Ms. Judd in the films.  But Weinstein torpedoed Ms. Judd's incredible professional opportunity when he told Mr. Jackson and Ms. Walsh that the studio had had a "bad experience" with Ms. Judd, and that Ms. Judd was a "nightmare" to work with and should be avoided "at all costs."

With those baseless smears, Weinstein succeeded in blacklisting Ms. Judd and destroying her ability to work on what became a multi-billion-dollar franchise with 17 Academy Award wins and many more nominations.  He also effectively blocked Ms. Judd from future opportunities to work

with Mr. Jackson and Ms. Walsh.  Through no fault of their own, Mr. Jackson and Ms. Walsh believed Weinstein—who was one of Hollywood's most powerful film producers and distributors at the time—and Miramax, the company acting at his direction—and dropped their pursuit of Ms. Judd. The pathetic reality, however, was that Weinstein was retaliating against Ms. Judd for rejecting his sexual demands approximately one year earlier, when he cornered her in a hotel room under the guise of discussing business.  A self-described "***benevolent dictator***" who has bragged that "***I can be scary***," Weinstein used his power in the entertainment industry to damage Ms. Judd's reputation and limit her ability to find work.[1,2,3]

Ms. Judd is not alone.  Other professional women learned that Weinstein was more than willing to smear them and tarnish their reputations to punish them for trying to reject him, resulting in both the actors' harm and Weinstein's financial gain.  These women and others have shared powerful accounts of their experiences, with some enduring (and courageously surviving) significant physical and emotional harm.  Ultimately though, this case is about business, and the central harm is economic.  Weinstein's wrongful and outrageous conduct has not just deprived Ms. Judd of the specific opportunity to play a prominent role in a blockbuster film trilogy; it has had a long-lasting ripple effect on the trajectory of her whole career.  No person—in whatever job, in whatever industry—should have to forfeit professional aspirations and the right to earn a living to the abusive whims of the powerful.  Ms. Judd brings this complaint to vindicate that principle, and to right the wrongs that Weinstein committed against her, among so many others.

### JURISDICTION AND VENUE[4]

1.     This Court has jurisdiction over the subject matter in this action pursuant to Article VI, Section 10 of the California Constitution, because this case is not given by statute to other trial courts.

---

[1]  All emphases added unless otherwise stated.

[2]  https://www.huffingtonpost.com/2012/06/15/harvey-weinstein-obama-will-win_n_1601201.html

[3]  https://cbspressexpress.com/cbs-news/releases/view?id=32117

[4]  This action was removed by Weinstein to federal court on June 28, 2018 pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 on the grounds of diversity of citizenship between the parties and satisfaction of the amount in controversy requirement.

FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

Gibson, Dunn &
Crutcher LLP

2.      In addition, the amount in controversy exceeds the minimum for unlimited civil jurisdiction of this Court.

3.      This Court has jurisdiction over Weinstein because, on information and belief, he regularly conducts business in this State, and his unlawful conduct toward Ms. Judd predominantly occurred and caused harm in this State.

4.      Venue properly lies in this County in that Weinstein regularly conducts business in this County and the conduct and events giving rise to the claims described herein occurred in this County. Moreover, a number of the witnesses to the events in question reside or regularly transact business in this County, and relevant evidence is believed to be located in this County as well.

## PARTIES

5.      Plaintiff Ashley Judd is a resident of Tennessee.  During the time in which the first events underlying Ms. Judd's complaint occurred (approximately 1996 through 1998), Ms. Judd resided for several months at a time in Los Angeles County.  Ms. Judd has also resided in Los Angeles County for significant stretches of time on multiple other occasions between 1993 and 2017, when she first learned of the harms done to her by Weinstein.

6.      Defendant Harvey Weinstein is a resident of New York.  Weinstein regularly came to Los Angeles County between 1996 and 1998 to conduct business on his own behalf and on behalf of the Santa Monica-based company, Miramax, that he controlled.  Afterward, Weinstein continued to come to Los Angeles regularly to conduct business on behalf of The Weinstein Company LLC, a California-registered business entity with an address in Los Angeles County.  On information and belief, Weinstein owns a residence in Los Angeles County.

## FACTUAL ALLEGATIONS

7.      Harvey Weinstein has reveled in his power and influence over actors and filmmakers for years.  On multiple occasions, he bragged how one musician/actor once called him "***The Punisher***."[5] To get an actor to promote a film, he said, "***I can be scary***."[6]  He regularly touted his political and

[5]  http://deadline.com/2012/01/oscar-qa-harvey-weinstein-on-the-artist-dueling-best-actress-contenders-and-indie-film-in-the-vod-age-222391/

[6]  https://cbspressexpress.com/cbs-news/releases/view?id=32117

FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

Gibson, Dunn &
Crutcher LLP

industry connections, took credit for launching careers, and played an active role in shaping film projects.  As the world now knows through numerous women's accounts, Weinstein used this power and influence to sabotage the careers of women who resisted his unwanted sexual demands.

8.      In late 2017, before shifting tactics to attack his accusers, Weinstein cited his purported "**demons**," and admitted that "**the way I've behaved with colleagues in the past has caused a lot of pain**."[7]  That behavior included taking purported "business meetings" in a bathrobe and demanding massages and sexual favors.  Weinstein's more recent response to accusations against him, digging up any photograph in which he appears with an accuser to implicitly call her a liar, is far more genuine.  Weinstein is a predator and a bully, and his retaliation against women, including Ms. Judd, for saying "No," is part of a pattern that reflects (among other things) the bad intent behind the comments he made about Ms. Judd during casting discussions for *The Lord of the Rings*.

A.      **Weinstein's Rise to Power.**

9.      Weinstein was a major player in the entertainment industry for several decades, beginning with the opening of a small movie theater in upstate New York in the early 1970s.  By 1979, Weinstein founded a film company, Miramax, with his younger brother, Robert ("Bob").  Weinstein and Santa Monica-based Miramax enjoyed increasing success throughout the 1980s and 1990s, distributing and producing commercially successful—and in many cases, critically acclaimed—films (including *Scandal* (1989); *Sex, Lies, and Videotape* (1989); *Tie Me Up! Tie Me Down!* (1989); *The Crying Game* (1992); *Pulp Fiction* (1994); *Flirting with Disaster* (1996); and *Shakespeare in Love* (1998)), which grossed hundreds of millions of dollars worldwide and won numerous Academy Awards.  Along the way, Weinstein took credit for Miramax's decision to give several well-known filmmakers their "early breaks."[8]

10.      As Miramax's—and by extension, Weinstein's—success grew, Weinstein gained more power and cachet in the industry.  By the late 1990s, Weinstein was one of the most powerful and

---

[7]  https://www.nytimes.com/interactive/2017/10/05/us/statement-from-harvey-weinstein.html

[8]  http://variety.com/1999/voices/columns/talented-weinstein-survives-a-bumpy-99-1117760139/

Gibson, Dunn &
Crutcher LLP

FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

influential producers in the film business, declaring in one interview that "[i]f styles of filmmaking are changing radically, *I feel like the godfather of that change* – that's the Miramax legacy."[9]

11.     On information and belief, at all relevant times, and even after the Walt Disney Company agreed to purchase Miramax for nearly $60 million in 1993, Weinstein continued to enjoy nearly plenary control of Miramax, its agents, the films it would produce and/or distribute, the budget of those films, the casting decisions, and even the creative vision for them.[10]

12.     In contrast to Weinstein—by then an established figure—in or around 1997, Peter Jackson and his producing partner Fran Walsh were just beginning their ascent to worldwide recognition and success.  They received a 1995 Academy Award nomination for Best Original Screenplay for *Heavenly Creatures* (1994), but their influence in the industry and ultimate control over projects (including casting decisions) in the late 1990s was more limited than Weinstein's.

13.     In or around 1997, Mr. Jackson and Ms. Walsh were considering adapting J.R.R. Tolkien's *Lord of the Rings* book trilogy into a series of films.  Because of a licensing requirement, any adaptation of the trilogy had to be offered first to Weinstein's company, Miramax, which Mr. Jackson and Ms. Walsh did.  As a result of this arrangement, Miramax developed the *Lord of the Rings* films for approximately 18 months, with Weinstein involved in many casting discussions regarding the films.  Although Miramax eventually sold the rights to the series to New Line Cinema ("New Line"), it retained a 5% stake in the films' adjusted gross receipts, half of which ultimately accrued personally to Weinstein and his brother Bob.

14.     Weinstein continued to enjoy broad commercial and critical success during the 1990s and 2000s through dozens of projects, including the *Bridget Jones* films (2001 and 2004); *Chicago* (2002); *Frida* (2002); *The Hours* (2003); the *Kill Bill* films (2003, 2004), and many others. During this period, Weinstein wielded significant power and influence in the entertainment world and beyond.

---

[9]   http://variety.com/1999/voices/columns/talented-weinstein-survives-a-bumpy-99-1117760139/

[10]   Miramax continues to maintain an office in Los Angeles, California.

Gibson, Dunn & Crutcher LLP

FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

**B.     Weinstein's Pattern of Predation and Threatening Actors' Careers.**

15.     For decades, Weinstein used his power and influence in the industry to target women like Ms. Judd and attempt to extract sexual favors while stating explicitly or implicitly that their career prospects hung in the balance.  Within the last year alone, there has been no shortage of reports of Weinstein's decades-long pattern of abusive acts, and many reflected a similar plan and well-established modus operandi: in many instances, he would corner women in a hotel room under the guise of discussing business.  He often appeared only in a bathrobe and asked the women to watch him shower, or give him a massage.  Others described more graphic and explicit demands for sexual acts.[11]  When some of these women pushed back, in multiple cases—as in Ms. Judd's, detailed below—he retaliated against them by threatening to derail or actually derailing their careers.

16.     For example, one actor and producer, Salma Hayek Pinault, publicly described encounters at hotels, after she had signed on to produce a film with Miramax, where Weinstein would appear unexpectedly at her door and ask her to allow him in.  He reportedly asked her to shower with him, to let him massage her, to let him give her oral sex, and to get naked with another woman.  At one point after Ms. Hayek Pinault steadfastly refused these requests, she recalls that Weinstein said, "***I will kill you, don't think I can't.***"  As she put it in an essay she wrote about the experience, "I don't think he hated anything more than the word 'no.'"  But Weinstein's manipulative conduct did not end there: on one occasion, he agreed to fund a film that had long been a passion project for Ms. Hayek Pinault—but because she had refused his demands, he held the film hostage and refused to move forward with it unless she agreed to engage in an unscripted sex scene with another woman involving full-frontal nudity.  Feeling she had no choice five weeks into shooting and after the years of effort she had devoted to the film, Ms. Hayek Pinault complied.  Weinstein never offered her a starring role in a film again.[12]

---

[11] *See* https://www.usatoday.com/story/life/people/2017/10/27/weinstein-scandal-complete-list-accusers/804663001/

[12] https://www.nytimes.com/interactive/2017/12/13/opinion/contributors/salma-hayek-harvey-weinstein.html

FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

Gibson, Dunn & Crutcher LLP

17.     Another actor, Uma Thurman, has said publicly that she knew Weinstein "pretty well before he attacked me."  At a meeting in Weinstein's hotel room in Paris, where they were discussing a script, he donned a bathrobe and led her to a steam room.  Although Ms. Thurman described how she got away that time, she reported that on another occasion shortly thereafter, Weinstein charged at her in a hotel room and pushed her down while trying to expose himself.  When she subsequently confronted him about it, he threatened to ruin her career—a credible threat given that, as Ms. Thurman put it, Weinstein had a "chokehold" on the type of films she wanted to work on and the directors she wanted to work with.  Through a spokesperson, Weinstein framed these events as "***making a pass***" at Ms. Thurman "***after misreading her signals***."  In response to Ms. Thurman's allegations, he sent what a reporter described as six "chummy photos" of Weinstein and Ms. Thurman at premieres and parties.[13]

18.     Another actor, Rosanna Arquette, endured similar predatory behavior.  In the early 1990s, she was supposed to meet Weinstein at the Beverly Hills Hotel to pick up a script for a new film.  When she arrived, she was directed to Weinstein's room.  As Ms. Arquette described it to a reporter, he answered the door in a bathrobe, told her his neck was sore, and said that he needed a massage.  He grabbed her hand and put it on his neck, and then forced her hand onto his erect penis.  When she refused to give in to his sexual demands, he told her she was making a huge mistake by rejecting him, and suggested she would have a far easier time with her career if she complied.  Ms. Arquette remained steadfast, and believes she lost a role because she rejected Weinstein.[14]

19.     Yet another actor—Annabella Sciorra—has publicly described actions by Weinstein towards her  in the 1990s.  At the time, her career was taking off, and Weinstein's studio, Miramax, was taking on a more dominant role in the industry.  Ms. Sciorra has described how Weinstein continued to sexually harass her after she attempted to reject him.  She has also noted that she felt the impact on her livelihood almost immediately, stating that she believes she did not work from 1992 to

---

[13]  https://www.nytimes.com/2018/02/03/opinion/sunday/this-is-why-uma-thurman-is-angry.html

[14]  https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories

Gibson, Dunn & Crutcher LLP

FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

1995 because the "Harvey machine" spread a baseless rumor that she was "difficult."  She believes it was Weinstein who used his influence in the entertainment industry to make false statements of fact about her and harm her career.[15]

20.    These incidents reflect Weinstein's malicious intent to injure those who resisted him, including Ms. Judd.  Another event showing that intent occurred in 1995, when Weinstein and actor Mira Sorvino were both at the Toronto Film Festival to promote the same film.  As Ms. Sorvino has recounted publicly, Weinstein—who was a producer on the film she was in Toronto to promote—led her to a hotel room, started to massage her, and virtually chased her around the room.  Ms. Sorvino managed to escape, but, undaunted, Weinstein contacted her a few weeks later claiming to have new marketing ideas for their film.  When she offered to meet him in a public location to discuss it, Weinstein showed up at Ms. Sorvino's home instead, and left her alone only when she pretended that her boyfriend was about to come over.[16]

21.    Weinstein made false statements of fact about Ms. Sorvino to others in the film industry in order to punish her and damage her career.  These comments included, but were not limited to, statements made to Mr. Jackson and Ms. Walsh in a private business meeting that Ms. Sorvino was "a nightmare to work with," "should [be] avoid[ed] at all costs," and that Miramax had had a "bad experience" with her in the past.[17]  As in Ms. Judd's case, these statements both were false on their face and falsely implied that Weinstein had knowledge of negative experiences working with Ms. Sorvino.

22.    Public accounts confirm that many other women—both in and outside of the entertainment industry—have suffered actual and threatened reputational and professional harm (in addition to physical and emotional harm) because Weinstein maliciously targeted them and sought to sabotage their careers.  Weinstein's egregious harassing acts, as well as the harm caused thereby,

---

[15] https://www.newyorker.com/news/news-desk/weighing-the-costs-of-speaking-out-about-harvey-weinstein

[16] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories

[17] http://www.vulture.com/2017/12/peter-jackson-weinstein-smeared-ashley-judd-mira-sorvino.html

continued as part of a well-established pattern through at least October 2017.[18]  The experiences of these women—which California courts describe as "me too" evidence—further demonstrate Weinstein's misconduct and bad intent.

23.    Ambra Battilana Gutierrez's experience also provides direct evidence of Weinstein's continued pattern and practice of abusing and threatening women.  Specifically, a recording reported to have been part of a March 2015 New York Police Department sting operation includes an exchange between Weinstein and then 22-year-old Ms. Gutierrez, who accused Weinstein of groping her breasts in what she thought was a business meeting.  In the recording, reportedly from the bar of the Tribeca Grand Hotel, Ms. Gutierrez asks, "Why yesterday you touch my breast?"  Weinstein responds, "Oh, please.  I'm sorry.  Just come on in.  *I'm used to that*."  Ms. Gutierrez asks, incredulously, "You're used to that?"  Weinstein responds, "Yes, come in."  At another point in the recording, Weinstein boasts, "*I'm a famous guy,*" and, after having instructed Ms. Gutierrez to "get in here," orders her to "come here now."  He then warns:  "*Five Minutes.  Don't ruin your friendship with me for five minutes*."[19]

### C.    Weinstein Targets Ms. Judd.

24.    Against this backdrop, Ms. Judd's experience sounds eerily familiar.  In or around late 1996 or early 1997, Weinstein invited Ms. Judd—at that point, in her twenties and still a relative newcomer to Hollywood—to a breakfast meeting at the Peninsula Hotel in Beverly Hills, ostensibly to discuss potential roles in films and to build her professional profile with the influential film producer who had connections with successful film-makers and others involved in the casting of movies.  It was a business meeting, not a job interview for any particular role.

25.    "General" meetings like the one that Ms. Judd thought she had planned with Weinstein are common in Hollywood, as they were in the late 1990s.  They are a form of business development— ways to develop and expand professional relationships between actors and studio executives,

---

[18]  The accounts described herein are not comprehensive and are in no way meant to suggest that some women's experiences with Weinstein are to be valued or credited more than others.

[19]  http://www.newsweek.com/full-transcript-harvey-weinstein-accuser-tried-turn-down-his-advances-12-times-681711

FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

Gibson, Dunn &
Crutcher LLP

producers, or casting directors over the long term. "General" meetings involve less-established talent who have a toehold in the industry but are not so firmly established that work presumptively finds them. They are inherently evaluative, with the studio executive, producer or casting director controlling the work and considering—like a banker or a loan officer—whether the actor is "qualified." "General" meetings can result in work in the short term, or can be used to develop a connection that pays dividends for an actor down the road. A studio executive or producer like Weinstein would be in a position to offer a type of service by, for example, recommending the actor to a director or casting director looking to fill a role. That director or casting director someday might call on that recommendation for a future project, even if it is at a different studio or with a different producer. Unlike, for example, the relationship between a collection service and a debtor, the relationship reflected in a "general" meeting is collaborative. It is an effort to find any mutual benefit now and in the future, with the studio executive, producer, or casting director holding himself out as being able to help the actor establish working relationships in the industry, and the actor trusting that that person will act professionally at the meeting and afterward. These meetings also offer opportunities for mentorship between established influencers who control access to opportunities and up-and-coming talent who seek guidance and access to those opportunities. They are intended to be part of an ongoing relationship.

26.     During this period in the late 1990s, Weinstein regularly stayed at the Peninsula Hotel when in Los Angeles County on business. When Ms. Judd arrived, she was directed not to the dining room or a conference room, but to Weinstein's private hotel room. Assuming the business meeting was to occur, she went to the room. At that time, Weinstein was a dominant figure in the film business and the gatekeeper to many desirable roles and film projects. Ms. Judd rightfully believed that alienating or offending him could damage her career. As an actor trying to build a reputation and establish herself in Hollywood, she had little choice but to engage with the powerful and influential film producer and distributor.

27.     When Ms. Judd arrived at the room, Weinstein appeared in a bathrobe, and, instead of discussing film roles or her professional aspirations, asked if he could give her a massage. She refused. He asked her to help him pick out clothes and to watch him shower. She refused again.

There was no one else in the room and no way for someone to come in to help her because the door was locked to the outside.  Ms. Judd reasonably believed that Weinstein intended to physically assault her.  Cornered, and desperate to escape without angering a man who had the ability to end her budding career, Ms. Judd engaged in a mock bargain with Weinstein, suggesting that she would consider letting him touch her only if she won an Academy Award in one of his films.  Weinstein responded:  "when you get nominated."  Ms. Judd held firm, saying, "No, when I win."  And then she fled the scene.[20]

28.     Immediately after exiting Weinstein's room, Ms. Judd went straight downstairs to the hotel lobby, where her father, who happened to be visiting from Kentucky, was waiting for her.  Upon seeing Ms. Judd, her father told her that she looked like something "devastating" had happened to her.[21]  Ms. Judd then told her father what Weinstein had done only minutes earlier.  She repeated the story to her mother not long after.

29.     Unlike many other professions, the film industry has an annual series of festivals and awards ceremonies attended by a regular group of film-makers and actors.  For more than 20 years, Weinstein, along with other successful producers, was a fixture at those events and other gatherings (including, for example, the frequent Hollywood charity events).  Ongoing relationships between producers and actors are forged and maintained in these settings.  Even aside from these events, Weinstein was a central, unavoidable figure in the film industry for an actor who wanted to work in movies.  By the late 1990s, he had been making movies for decades and would continue to make movies for decades more.  Neither Ms. Judd nor any other film actor could escape his professional presence and influence over a large segment of the film business.  The professional relationship between Weinstein and Ms. Judd (and other actors) was longstanding and impossible to terminate without jeopardizing the actor's livelihood.  Indeed, after that day at the Peninsula Hotel, Weinstein would continue to lord that traumatic moment over Ms. Judd, telling her at several such Hollywood

---

[20]   http://nationalpost.com/entertainment/celebrity/ashley-judd-says-a-deal-helped-her-flee-from-weinstein

[21]   http://www.vulture.com/2017/12/why-ashley-judd-went-on-the-record-about-harvey-weinstein.html

FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

events something to the effect that he had "found that role for [her]," that he was "still looking for [her] movie," and that he "still remembered [their] little deal." Weinstein's conduct was so egregious as to fundamentally alter the professional relationship between Weinstein and Ms. Judd.

**D.     Weinstein Retaliates Against Ms. Judd.**

30.     A year or so after Weinstein cornered her at the Peninsula Hotel, Ms. Judd, whose star had been rising following the release of the 1997 thriller *Kiss the Girls*, was in serious discussions to play a major role in a trio of upcoming films to be directed by Peter Jackson: specifically, *The Lord of the Rings*. In or around 1998, Mr. Jackson and his partner, Fran Walsh, invited Ms. Judd to a private meeting in Los Angeles County. During that meeting, they showed Ms. Judd their ideas for the film, the story boards, the costumes—essentially, their entire vision for how the film would be executed. Giving an actor this rare creative insight into such an eagerly anticipated and secretive project demonstrated that Ms. Judd was at an advanced stage of the casting process. Mr. Jackson and Ms. Walsh then asked Ms. Judd which of two potential roles she most identified with and which she would prefer. They liked Ms. Judd very much and intended to cast her in their films, which were set to begin principal photography in or around October 1999.

31.     During the meeting, Mr. Jackson and/or Ms. Walsh told Ms. Judd that they had had a similar meeting with actor Viggo Mortensen, who also was in serious discussions to play a major role in the *Lord of the Rings* films. Shortly after her meeting with Mr. Jackson and Ms. Walsh, Ms. Judd spoke with Mr. Mortensen, whose choice of film projects she respected, about whether he would accept the role and be willing to move to New Zealand to shoot the films. After he explained his thinking to her, Ms. Judd also made up her mind to go to New Zealand to shoot the films. Mr. Mortensen ultimately appeared in all three films in the *Lord of the Rings* series.

32.     At this point, on information and belief, Weinstein's production company, Miramax, still held the rights to the *Lord of the Rings* films. Thus, not long after the 1998 meeting with Ms. Judd in Los Angeles County, Mr. Jackson and/or Ms. Walsh expressed their enthusiasm for casting Ms. Judd in *The Lord of the Rings* to Miramax and Weinstein. By this time, Weinstein had spent well over a year actively involved in casting discussions for the films, among other things. As Mr. Jackson stated in a December 2017 interview, Miramax (*i.e.*, Weinstein) told him and Ms. Walsh, in confidence, that

Ms. Judd—and Ms. Sorvino, whom Mr. Jackson and Ms. Walsh were considering for a different role in the films—were "a nightmare to work with and [that Mr. Jackson and Ms. Walsh] should avoid them at all costs."[22]  As Mr. Jackson noted in a subsequent statement, Miramax also claimed to have had "'bad experiences'" with the two actors in the past.[23]  Mr. Jackson and Ms. Walsh contemporaneously relayed these disparaging statements about Ms. Judd (and Ms. Sorvino) to at least one other individual, a co-collaborator and business partner, who was also involved in casting decisions for *The Lord of the Rings*.

33.     These statements of purported fact, made by Weinstein, were false.  At that time, Ms. Judd had worked on a single Miramax film, *Smoke*, in 1995, and spent approximately two days on set in a limited role.  Ms. Judd does not recall any professional interactions with Weinstein or any other Miramax producer in connection with that film, and her experience was uniformly positive.  In fact, years later, Weinstein cast Ms. Judd in two separate films, *Frida* (2002), and *Crossing Over* (2009), and his authorized representative claimed in December 2017 that at one point, Ms. Judd had been "the top choice for Miramax and Mr. Weinstein" to play a major role in *Good Will Hunting* (1998).[24]  The malicious statements of purported fact that Weinstein made to Mr. Jackson and Ms. Walsh about Ms. Judd were knowingly false and falsely implied that Weinstein knew negative facts about Ms. Judd's professionalism and work conduct.  In fact, there was no "bad experience" to speak of.

34.     These false statements were made knowing that they would disrupt Ms. Judd's relationship with Mr. Jackson and Ms. Walsh.  As a direct result of these statements, Mr. Jackson and Ms. Walsh did not cast Ms. Judd in the *Lord of the Rings* films or in any of their subsequent films because they had been told that Ms. Judd would act unprofessionally and cause problems on set.  Although the statements about Ms. Judd did not fit with the impression Mr. Jackson and Ms. Walsh

---

[22]  https://www.stuff.co.nz/entertainment/99921399/sir-peter-jackson-harvey-weinstein-made-me-blacklist-stars

[23]  https://apnews.com/4a8590d6a62848c4a61ba4676827f16a/Peter-Jackson's-Weinstein-story-opens-old-wounds-for-Sorvino

[24]  https://www.thewrap.com/harvey-weinstein-fires-back-peter-jackson-ashley-judd-mira-sorvino-backlash/

Gibson, Dunn &
Crutcher LLP

had gained during their meeting with Ms. Judd, they believed the statements were genuine. As Weinstein knew, the negative facts expressed and implied about Ms. Judd made it more likely she would not be cast and were particularly salient under the circumstances: An actor who was a "nightmare to work with" would have been particularly problematic for a high-stakes, multi-part production like *The Lord of the Rings*, filming for months on location in New Zealand thousands of miles from the actor's home.

35.     New Line eventually obtained the rights to the *Lord of the Rings* films from Miramax. Mr. Jackson and Ms. Walsh had a great deal of discretion over the casting for the films. If they wanted an actor to be cast in the films, and their choice was reasonable (as casting Ms. Judd would have been), then New Line approved. If Mr. Jackson and Ms. Walsh had recommended to New Line that Ms. Judd be cast in the films, New Line would have agreed. Moreover, with the clout they gained through the extreme success of *The Lord of the Rings*, it is further alleged, on information and belief, that Mr. Jackson and Ms. Walsh had the power to unilaterally decide to cast Ms. Judd in one of their subsequent films, such as the three films in *The Hobbit* trilogy, which included at least one of the roles for which Ms. Judd had been considered in the *Lord of the Rings* films. But for Weinstein's false statements and malicious interference (which he sought to conceal through Miramax), Ms. Judd alleges that Mr. Jackson and Ms. Walsh would have done so.

36.     Ms. Judd would have realized the economic advantage of working on *The Lord of the Rings* and/or other films with Mr. Jackson and Ms. Walsh but for Weinstein's malicious interference. The false statements he made to Mr. Jackson and Ms. Walsh were motivated by a desire to retaliate against Ms. Judd for rejecting his unwanted sexual overtures and were intended to cause Ms. Judd professional harm.

37.     Until December 2017, Ms. Judd did not know why she was not cast in the *Lord of the Rings* films. Given her prior experience in the film industry, Ms. Judd reasonably believed that asking Mr. Jackson and Ms. Walsh why she was removed from consideration would have risked alienating them and negatively affected their willingness to consider her for future projects. Even if Ms. Judd had asked Mr. Jackson and Ms. Walsh why they removed her from consideration for *The Lord of the Rings*, they would not have disclosed the statements Weinstein made about her, given that

those statements were made in confidence.  Further, doing so would have risked damaging their own relationship with the powerful producer, film distributor, and owner of rights to a percentage of profits in *The Lord of the Rings*.

38.     The *Lord of the Rings* films went on to earn more than $2.5 billion in global ticket sales and were nominated for 30 Academy Awards, ultimately winning 17, including Best Picture, Best Director, and Best Adapted Screenplay wins for the third film, *The Lord of the Rings: Return of the King* (2003).  Those three films were followed in 2012 by the film trilogy *The Hobbit* (based on the J.R.R. Tolkien novel of the same name), which was also directed by Mr. Jackson and grossed nearly $1 billion worldwide.  Because of the statements Weinstein made about Ms. Judd, Mr. Jackson and Ms. Walsh did not consider her for a role in *The Hobbit* films.

39.     At the time Weinstein made false statements about Ms. Judd and Ms. Sorvino, Mr. Jackson and Ms. Walsh had no knowledge of Weinstein's behavior toward women or his pattern of retaliating against those who refused him.  Nor were they aware of Ms. Judd's prior encounter with Weinstein at the Peninsula Hotel in Beverly Hills.

40.     Years later, and shortly after reading the accounts of numerous women (including Ms. Judd) naming Weinstein as the perpetrator of years of harassing conduct, Mr. Jackson recalled the statements about Ms. Judd and began to question their veracity.  In a December 2017 interview, Mr. Jackson revealed that he and Ms. Walsh had chosen not to pursue the casting of Ms. Judd as a direct result of the statements Weinstein, directly and through Miramax, had made about her professionalism as an actor.  As Mr. Jackson explained, "[a]t the time, we had no reason to question what [Miramax was] telling us – but in hindsight, I realise that this was very likely the Miramax smear campaign in full swing.  I now suspect we were fed false information about both of these talented women [*i.e.*, Ms. Judd and Ms. Sorvino], and ***as a direct result*** their names were removed from [*The Lord of the Rings*] casting list."[25]  It was only after this interview was published that Ms. Judd learned that Weinstein's conduct was the reason why she had not been cast in the *Lord of the Rings* films.

---

[25]  https://www.stuff.co.nz/entertainment/99921399/sir-peter-jackson-harvey-weinstein-made-me-blacklist-stars

Gibson, Dunn & Crutcher LLP

FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

41.     On or about December 16, 2017, Weinstein's authorized representative made a public statement in response to Mr. Jackson's account.  Weinstein's authorized representative **did not** defend the truth of the statements or state that Weinstein believed them to be true.  Instead, the authorized representative claimed that Weinstein "had no input into the casting whatsoever."  Weinstein (again, through his authorized representative) even noted that Ms. Judd "was cast in two other films by Mr. Weinstein."  As for Ms. Sorvino, she "was always considered for other films as well."[26]  In a follow-up statement, Weinstein's authorized representative doubled down, stating that "[a]round the time of *Rings*, Mr. Weinstein cast Ms. Judd in *Frida* and years later, in *Crossing Over*."  Weinstein (through his authorized representative) added, "Miramax had flown Ashley to New York for casting discussions and to meet the production team for *Good Will Hunting*," further claiming that "Ashley was the top choice for Miramax and Mr. Weinstein."[27]

42.     By his own authorized public statements, then, Weinstein has conceded the falsity of any claim that Ms. Judd was a "nightmare" to work with, that she should be "avoided at all costs," or that Weinstein or Miramax had had a "bad experience" with her.  The only dispute appears to be whether Weinstein, directly or through Miramax, in fact said those things to Mr. Jackson and Ms. Walsh.  Mr. Jackson has said in a published rebuttal to Weinstein that Miramax did make those statements, and that Ms. Walsh "remembers these negative comments about Ashley and Mira as clearly as I do."[28]  Weinstein—who has said, "*I came of age in the 60's and 70's, when all the rules about behavior and workplaces were different*"—claims he did not make the specious claims about Ms. Judd.[29]  Ms. Judd is eager to have a jury decide whom to believe.

43.     Indeed, another telling statement offered by Weinstein (through his authorized representative) in December 2017 was, "***After the success of* Lord of the Rings*, Peter Jackson was***

---

[26]  http://ew.com/movies/2017/12/15/peter-jackson-weinstein-smear-mira-sorvino-ashley-judd/

[27]  https://www.thewrap.com/harvey-weinstein-fires-back-peter-jackson-ashley-judd-mira-sorvino-backlash/

[28]  http://deadline.com/2017/12/peter-jackson-rebukes-harvey-weinsteins-ashley-judd-mira-sorvino-lord-of-the-rings-1202228217/

[29]  https://www.nytimes.com/interactive/2017/10/05/us/statement-from-harvey-weinstein.html

FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

*so powerful he could have cast anyone he wanted in the* **Hobbit**. ***Neither Ms. Judd nor***

***Ms. Sorvino had roles in the film.***"[30]  Ms. Judd could not say it better herself: Weinstein's smears

blocked Ms. Judd from working with the director gifted with what Weinstein himself called

"creative genius."  Mr. Jackson could have cast Ms. Judd in *The Hobbit* films, but he did not even

consider her *because of* the false statements Weinstein made about her professionalism and

Miramax's purported "bad experience" with her.  These false statements of course denied Ms. Judd

the significant opportunity to work with Mr. Jackson on one of his films.  They also denied her all the

opportunities she would have had with other filmmakers going forward if she had worked on one of

Mr. Jackson's successful and critically acclaimed projects.

44.     Weinstein's ongoing attempts to discredit his accusers by putting forward photographs

showing him and those accusers together in public further supports Ms. Judd's claims.  Weinstein

apparently intends to suggest that he could not have harassed, made unwanted advances toward, or

threatened the women who then appeared in photographs with one of Hollywood's most powerful

gatekeepers to the creation and casting of the films in which they worked.  The photographs include

one of Ms. Judd, taken in or around 1997 after the encounter at the Peninsula Hotel, that Weinstein

apparently provided to ABC News.  In the photograph, Weinstein smiles as he clasps Ms. Judd's

wrist at a public event.  Far from being exculpatory, this photograph—along with another showing

Weinstein pressing himself against Ms. Judd while bending back her arm—reflects the size

advantage Weinstein had over Ms. Judd.  It also reflects that Ms. Judd was too scared to make a

scene at a public Hollywood gathering when standing next to the self-proclaimed "godfather" of a

new film movement, a man who socialized with U.S. presidents and held the fate of film projects—

and the livelihoods of actors who worked on them—in his hands.  Weinstein, for his part, is all smiles

and gives no indication at all that he believed Ms. Judd was a "nightmare" to work with whom

filmmakers should avoid "at all costs."

---

[30]  https://www.thewrap.com/harvey-weinstein-fires-back-peter-jackson-ashley-judd-mira-sorvino-backlash/

FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

Gibson, Dunn &
Crutcher LLP

**E.      Weinstein Benefitted Financially from His Misconduct.**

45.      On information and belief, Weinstein's compensation from the 1990s through October 2017 was affected by the financial performance of Miramax and The Weinstein Company.  The higher the profits, the more compensation for Weinstein.  On information and belief, the less that Miramax or The Weinstein Company paid actors for their services, the better the financial results of those companies and the greater the financial benefit for Weinstein.

46.      Weinstein's blacklisting of actors to other filmmakers and/or studios was retaliatory conduct in the context of the actors' professional relationships with Weinstein.  While his egregious behavior harmed the actors' careers, it had the ancillary benefit for Weinstein of increasing his power over those actors.  It was also profitable, because he (and his companies) could pay the actors less for their services.

47.      A significant factor in the negotiation of an actor's compensation for a film role is "precedent"—that is, what she has been paid for past projects.  This precedent, typically called the actor's "quote," is also affected by the success of the film project.  If Ms. Judd had had a major role in a multi-billion-dollar film franchise, that would have increased her quote (in which she had a vested interest).  It would have given her increased bargaining power for future projects and it would have increased the amount of money for which she could negotiate to act in future films (including films produced or distributed by Weinstein's companies).  Weinstein knew that.  Weinstein's clandestine actions to interfere with actors' abilities to get other roles enabled Weinstein and his companies to pay less money for the actors' services than they otherwise would have had to pay.  That is true for Ms. Judd as well:  as a result of Weinstein's actions, he obtained her acting services in two subsequent films—*Frida* and *Crossing Over*—at a lower quote than he would have otherwise had to pay.  Weinstein thereby obtained ill-gotten gains at Ms. Judd's expense.

48.      While Weinstein profited, actors like Ms. Judd and Ms. Sorvino, who were thwarted in their efforts to be cast in career-defining or other roles, can never fully be made whole for those lost opportunities.  They lost out on higher salaries, residuals, public exposure, more professionally and financially rewarding opportunities, and other tangible and intangible benefits.  The same is true of other actors who may have had no other choice but to accept a role on a Weinstein film because

FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

Gibson, Dunn &
Crutcher LLP

Weinstein or his agents had dissuaded other studios and filmmakers from hiring them.  Weinstein's retaliatory misconduct increased the actors' dependence on him for work.  Weinstein intended for this dependence to increase the likelihood that the actors who resisted him would give in to his sexual demands.

**F.      Weinstein Remains a Threat to Women's Careers.**

49.      Weinstein has openly claimed that "if he makes enough progress," he wants to "be given a second chance."  Weinstein thus has indicated that he intends to return to Hollywood and to resume his work in the entertainment industry.  His pattern of threatening and retaliatory conduct remains a danger to women generally and to actors like Ms. Judd in particular.

## FIRST CAUSE OF ACTION

### (Defamation at Common Law and Civ. Code, § 46 –

### Slander, False and Unprivileged Publications)

50.      Ms. Judd incorporates by reference all preceding allegations as though fully set forth herein.

51.      In telling and causing Mr. Jackson and Ms. Walsh to be told in a private conversation that Ms. Judd was "a nightmare to work with," should be "avoid[ed] at all costs," and that Miramax had a "bad experience" with Ms. Judd in the past, Weinstein expressed and caused Miramax to express purportedly factual statements about Ms. Judd and implied that there was a factual basis to evaluate Ms. Judd's work style and professionalism.

52.      Weinstein intentionally communicated these specific statements about Ms. Judd to Mr. Jackson and Ms. Walsh.

53.      Mr. Jackson and Ms. Walsh understood these statements to refer to Ms. Judd, and specifically, to mean that Ms. Judd would be an ill-advised casting choice for the *Lord of the Rings* films and should not be selected for any role in those films, or any other film.

54.      The private statements Weinstein made to Mr. Jackson and Ms. Walsh concerning Ms. Judd were false.  At the time these statements were made (in or around 1998), Weinstein's professional connection to Ms. Judd consisted of serving as an executive producer on *Smoke*, the sole

Miramax film in which she had appeared.  Ms. Judd had had a uniformly positive experience in a small role in that film and no professional interactions with Weinstein or any other producer.  There was no factual basis to tell Mr. Jackson and Ms. Walsh that Ms. Judd was a "nightmare to work with," that she should be avoided "at all costs" or that Miramax had had a "bad experience" with her.  These statements themselves are express false statements of fact, and they falsely implied a knowledge of negative facts about Ms. Judd's professionalism and ability to work with others.  Ms. Judd did not have a "bad experience" with Miramax or Weinstein.  There was likewise no factual basis to say that Ms. Judd worked poorly with others or that her involvement would cause problems for a film project.  The statements about Ms. Judd were complete fiction, crafted to seem credible and to cause maximum damage.  Notably, Ms. Judd was subsequently cast in two Miramax films (*Frida* and *Crossing Over*)—demonstrating the falsity of the statements and Weinstein's bad faith in making them and causing them to be made.  In fact, Weinstein **admits** that the statements attributed to him are false; he only denies making them.

55.     Weinstein made the above-described defamatory statements with actual malice—*i.e.*, with knowledge of their falsity, or, alternatively, with a reckless disregard for their falsity.

56.     Weinstein made these statements without privilege or justification.

57.     The above-described statements concerning Ms. Judd directly injured her by diminishing her reputation in her profession, trade, and/or business, which has a natural tendency to lessen her profits.

58.     The above-described statements convey a defamatory meaning.  They harm Ms. Judd's reputation as to lower it.

59.     It was Weinstein's expectation and intent that the defamatory statements would injure Ms. Judd economically, including by lessening her profits.

60.     As a result of the publication of these false and defamatory statements with actual malice, Ms. Judd was not selected for a role in the *Lord of the Rings* films or any of Mr. Jackson's and Ms. Walsh's other film projects.  Ms. Judd has suffered damages including but not limited to lost compensation, lost profits, loss to reputation, and increased costs.  These damages are not limited to the lost opportunity to work with Mr. Jackson and Ms. Walsh.  Rather, they include all the other

opportunities that Ms. Judd would have had to work on other projects with other filmmakers but for Weinstein's wrongful conduct, which had a long-lasting ripple effect on Ms. Judd's career trajectory as a whole.

61.     Ms. Judd did not discover, and had no reason to discover, what Mr. Jackson and Ms. Walsh had been told in confidential business discussions regarding a valuable film project until Mr. Jackson revealed in December 2017 that Miramax (*i.e.*, Weinstein) had convinced Mr. Jackson and Ms. Walsh not to work with Ms. Judd, and that they did not cast her as a result of the statements Weinstein made.

62.     Weinstein also acted with oppression, fraud, or malice as defined by California Civil Code section 3294 and engaged in highly reprehensible and despicable conduct warranting exemplary damages.

## SECOND CAUSE OF ACTION

### (Civ. Code, §§ 51.9 and 52 – Sexual Harassment in Professional Relationships)

63.     Ms. Judd incorporates by reference all preceding allegations as though fully set forth herein.

64.     Ms. Judd, an actor, was in a business, service, or professional relationship with Weinstein, a film producer, distributor, and purveyor of access to opportunities across the film industry, who purported to be able to help her land film roles.  At the time of the harassment, she was actively seeking acting roles in films and agreed to meet with Weinstein under the impression that he could assist her in finding such roles and/or give her direction, advice, and guidance about the types of roles that would best suit her.  In fact, she had previously worked on a 1995 film produced by Miramax (on which Weinstein was an executive producer) and, at the time of the harassment, was discussing potential roles in films produced or distributed by Weinstein or Miramax.  The "general" meeting that Ms. Judd expected to have with Weinstein was typical in the film industry in the late 1990s, and served to develop an actor's professional profile and working relationship with well-connected industry figures who could make or influence casting decisions in both the short and long term. Weinstein relished his role as the gatekeeper to those roles and controlled Ms. Judd's access to them.

He prided himself on his casting decisions and on his ability to help actors land roles on other projects through his network of contacts; indeed, he considered himself a broker of sorts between actors and filmmakers and was active in trying to facilitate such connections within an industry that relies on word-of-mouth recommendations.  Ms. Judd's professional relationship with Weinstein was also ongoing, as evidenced not only by the nature of film industry networking at the time, but also by the fact that she was cast in two subsequent Miramax films in 2002 and 2009.

65.     In or around late 1996 or early 1997, Weinstein harassed Ms. Judd, including by making sexual advances, solicitations, sexual requests, or demands for sexual compliance toward her in a hotel room at the Peninsula Hotel in Beverly Hills, where he had lured her under the guise of discussing potential roles in films.

66.     Weinstein's sexual advances, solicitations, requests, threats, and demands for sexual compliance toward Ms. Judd were unwelcome and severe, as indicated by her refusals to acquiesce to those demands and her immediate disclosure of those demands to her father and mother.  Ms. Judd reasonably feared for her safety in the locked hotel room, and Weinstein's conduct and statements constituted a threat of physical assault.

67.     Because of Weinstein's uniquely powerful role in the industry in which Ms. Judd worked, the prior working relationship between Ms. Judd and Miramax (the film company controlled by Weinstein), and Ms. Judd's relative lack of power and access as a young newcomer to Hollywood, she was unable to easily end her professional relationship with Weinstein.  Indeed, Ms. Judd continued to have a business/professional relationship with Weinstein, as evidenced by the fact that he cast Ms. Judd or had her cast in two subsequent Miramax films in 2002 and 2009, and played a role in her being considered for at least one other Miramax-distributed film as well.

68.     Weinstein's conduct was so egregious as to fundamentally and permanently alter the condition of the professional relationship between Weinstein and Ms. Judd.

69.     As a result of Weinstein's acts—and Ms. Judd's refusal to acquiesce to his improper demands—Ms. Judd suffered harm, including but not limited to economic injury.  Among other things, Weinstein falsely told Mr. Jackson and Ms. Walsh that Ms. Judd was a "nightmare" to work with, should be avoided "at all costs," and that Miramax had a "bad experience" with Ms. Judd.  As a

result of these false statements, Mr. Jackson and Ms. Walsh terminated their efforts to cast Ms. Judd in what became a multi-billion-dollar, award-winning film franchise.  Ms. Judd consequently was wrongfully deprived of compensation she would have received from working on the films, compensation she would have received from working on any subsequent films with Mr. Jackson and Ms. Walsh, and compensation she would have received from other studios (including Weinstein's) in connection with other film projects if she had been a part of the *Lord of the Rings* franchise and its worldwide acclaim and financial success.

70.    Because Ms. Judd refused to submit to Weinstein's sexual demands, he fabricated facts about her and communicated them to Mr. Jackson and Ms. Walsh in order to convince Mr. Jackson and Ms. Walsh not to work with Ms. Judd.  In doing so, Weinstein intended to, and did, retaliate against Ms. Judd by damaging her professionally.

71.    Ms. Judd did not discover, and had no reason to discover, what Mr. Jackson and Ms. Walsh had been told in confidential business discussions regarding a valuable film project until Mr. Jackson revealed in December 2017 that Miramax had convinced him and Ms. Walsh not to work with Ms. Judd, and that they did not cast her as a direct result of the statements Weinstein made.

72.    Until December 2017, Ms. Judd thus did not discover, and had no reason to discover, that Weinstein in fact had retaliated against her for refusing to submit to his sexual demands.

73.    Weinstein also acted with oppression, fraud, or malice as defined by California Civil Code section 3294 and engaged in highly reprehensible and despicable conduct warranting exemplary damages.

74.    As a result of this unlawful conduct, Ms. Judd is entitled to actual damages and exemplary damages pursuant to California Civil Code section 52, subdivision (b)(1), in an amount to be awarded at trial.

## THIRD CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage)

75. Ms. Judd incorporates by reference all preceding allegations as though fully set forth herein.

76. Ms. Judd had an existing economic relationship with Mr. Jackson and/or Ms. Walsh. In 1998, Ms. Judd was in ongoing talks with Mr. Jackson and Ms. Walsh to be cast in one of two roles in the *Lord of the Rings* films, which ultimately earned billions of dollars at the box office. Her name had been added to a casting list, and had Weinstein not convinced Mr. Jackson and Ms. Walsh not to cast Ms. Judd, they would have recommended that she be cast in the films. Given these discussions, it is reasonably probable that, but for the statements Weinstein made to Mr. Jackson and Ms. Walsh, Ms. Judd would have been cast in the films and obtained an economic benefit.

77. Due to Miramax's and Weinstein's personal involvement with the *Lord of the Rings* films, and because Mr. Jackson and Ms. Walsh expressed their desire to cast Ms. Judd in the films, Weinstein knew of the prospective relationship between Ms. Judd, on the one hand, and Mr. Jackson, and/or Ms. Walsh, on the other hand.

78. Weinstein intentionally and wrongfully interfered with this prospective, beneficial economic relationship by communicating and causing false statements of fact to be communicated to Mr. Jackson and Ms. Walsh about Ms. Judd's work as an actor. In doing so, Weinstein intended to disrupt Ms. Judd's prospective economic advantage or knew that his actions were certain or substantially certain to achieve this result.

79. Weinstein's actions were independently wrongful and were proscribed by the following legal standards, including but not limited to:

   a. Common-law defamation and defamation under California Civil Code section 46;

   b. California Civil Code sections 51.9 and 52, which prohibit sexual harassment in professional relationships; and

   c. California Business and Professions Code section 17200 *et seq*.

Gibson, Dunn &
Crutcher LLP

FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

80.     Weinstein's actions were intentionally undertaken to inflict harm on Ms. Judd by impairing her work in her profession and business, and specifically, interfering with her relationship with Mr. Jackson and Ms. Walsh.

81.     Weinstein's acts, including the statements he made to Mr. Jackson and Ms. Walsh, resulted in an actual disruption of the beneficial economic relationship referenced above.

82.     Ms. Judd did not discover, and had no reason to discover, what Mr. Jackson and Ms. Walsh had been told in confidential business discussions regarding a valuable film project until Mr. Jackson revealed in December 2017 that Miramax had convinced him and Ms. Walsh not to work with Ms. Judd, and that they did not cast her as a direct result of the statements Weinstein made.

83.     Weinstein also acted with oppression, fraud, or malice as defined by California Civil Code section 3294 and engaged in highly reprehensible and despicable conduct warranting exemplary damages.

84.     As a proximate result of Weinstein's intentional interference with the aforementioned prospective economic relationships, Ms. Judd has suffered (and will continue to suffer) actual, consequential, and/or incidental damages, in the form of lost profits, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Violation of Bus. & Prof. Code, § 17200 *et seq.* (Unfair Competition Law))

85.     Ms. Judd incorporates by reference all preceding allegations as though fully set forth herein.

86.     The Unfair Competition Law ("UCL") prohibits any unlawful, unfair, and fraudulent business acts and practices.

87.     Weinstein has violated (and continues to violate) the UCL by engaging in the following unlawful acts and practices:

a.     Maliciously defaming Ms. Judd with respect to her profession, trade, and/or business in violation of California Civil Code section 46 and under the common law;

Gibson, Dunn &
Crutcher LLP

   b.  Engaging in a pattern of retaliatory conduct linked to sexual harassment against Ms. Judd and others in violation of California Civil Code sections 51.9 and 52; and

   c.  Intentionally interfering with Ms. Judd's prospective economic relationship with a business contact, to wit, Mr. Jackson and/or Ms. Walsh.

88.  Weinstein has violated (and continues to violate) the UCL by engaging in the following unfair business acts and practices:

   a.  Engaging in retaliatory harassing and malicious defamatory conduct, which provides no benefit to competition, such that Ms. Judd and other actors have been substantially injured in their professions and careers;

   b.  Engaging in harassing and malicious defamatory conduct such that Weinstein gains an unfair advantage over lawfully competing competitors, including but not limited to paying actors lower wages than he would otherwise have been required to do, and diminishing the actors' leverage and earning potential for future roles;

   c.  Implementing practices for the deliberate purpose of depriving actors of opportunities on an industrywide basis; and

   d.  Engaging in harassing and malicious defamatory conduct in violation of public policy as reflected in California Civil Code sections 46, 51.9, and 52.

89.  Weinstein indisputably profited from lower compensation costs as a result of his own acts of unfair competition against Ms. Judd.

90.  Ms. Judd did not discover, and had no reason to discover, what Mr. Jackson and Ms. Walsh had been told in confidential business discussions regarding a valuable film project until Mr. Jackson revealed in December 2017 that Miramax had convinced him and Ms. Walsh not to work with Ms. Judd, and that they did not cast her as a direct result of the statements Weinstein made.

91.  As a result of these acts, Ms. Judd was not selected for a role in the *Lord of the Rings* films or any of Mr. Jackson's and Ms. Walsh's other film projects.  Ms. Judd has suffered damages including but not limited to lost profits, loss to reputation, and increased costs.

92.    Weinstein gained an economic benefit as a result of the unlawful and unfair practices complained of herein, including but not limiting to lowering Ms. Judd's "quote."  As a result of Weinstein's unlawful and unfair practices, he obtained Ms. Judd's acting services in the two Miramax films in which she subsequently appeared (*Frida* and *Crossing Over*) at a lower rate than he would have had to pay but for his unlawful and unfair practices.  Ms. Judd has a vested interest in the higher quote she should have been paid for the work she performed on those films.

93.    Ms. Judd has no adequate remedy at law for the injuries that she will continue to suffer as a result of Weinstein's unlawful acts.

94.    Unless restrained by this Court, Weinstein will continue to pursue his campaign of unfair and unlawful conduct, including but not limited to using his pattern of abusive and harassing behavior to exert control over the professional careers of Ms. Judd and other actors, and to limit their wages and earnings.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Judd respectfully prays for the following:

A.    Damages, including general and special damages, in an amount to be determined at trial;

B.    Punitive damages;

C.    Restitutionary disgorgement;

D.    An order enjoining Weinstein from engaging in further retaliatory conduct toward Ms. Judd;

E.    An injunction requiring Weinstein to cease engaging in unfair competition;

F.    Prejudgment interest;

G.    Costs to the extent provided for by law, including attorney's fees as provided by statute; and

H.    An order awarding Ms. Judd such other and further relief as the Court deems just and proper.

1

2

DATED: October 19, 2018

3

4                                        GIBSON, DUNN & CRUTCHER LLP

5

6                                        By: _____

7                                              Theodore J. Boutrous, Jr.

8                                        Attorneys for Plaintiff Ashley Judd

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

1

## **DEMAND FOR JURY TRIAL**

2        Plaintiff Ashley Judd demands a jury trial of all triable issues.

3   DATED: October 19, 2018

4                                          GIBSON, DUNN & CRUTCHER LLP

5

6                                          By: _____

7                                                Theodore J. Boutrous, Jr.

8                                          Attorneys for Plaintiff Ashley Judd

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF